**JACK C., Appellant,**

v.

**TALLY C., Appellee.**

No. S–13990.

Supreme Court of Alaska.

Sept. 7, 2012.

David R. Edgren, Edgren Law Offices, LLC, Wasilla, for Appellant.

Tally C., pro se, Anchorage, Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A couple divorced in 2008, and the mother was granted sole legal custody and primary physical custody of their three children. At the time of the divorce, the superior court stated that if the father met certain conditions he could return to the court to seek modification of the child custody order. In 2009, he filed a motion to modify custody, seeking joint legal custody and increased visitation. The superior court, largely adopting a master's report and recommendations, left sole legal custody and primary physical custody with the mother, but expanded the father's visitation.

The father appeals from the superior court's 2010 custody modification order. Because the superior court neither committed clear error nor abused its discretion, we affirm the majority of the superior court's order. But because the superior court's order fails to explain why it did not order any changes to the father's visitation during the children's summer vacation, we remand for further explanation regarding summer visitation.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jack and Tally [1] met in Colorado during the mid–1990s and began a relationship. In August 2000, they married in California. They had three children during the course of their relationship: Kaleb, born in 1997; Jason, born in 1998; and Charles, born in 2001. Jack and Tally separated in July 2007.

### B. Proceedings

Tally filed for divorce in October 2007 and petitioned for a domestic violence protective order against Jack a week later. Although the present appeal relates to the superior court's September 7, 2010 child custody modification order, many of the issues raised on appeal regard the same factual circumstances that have existed since the original divorce filing.

#### 1. December 2007 domestic violence protective order hearing

Following Tally's petition for a domestic violence protective order, a hearing was held in December 2007. In that hearing, the superior court found that domestic violence had

---

1. We use pseudonyms to protect the family's privacy.

occurred with regard to two incidents: (1) Jack destroyed Tally's cell phone; and (2) Jack made harassing phone calls to Tally at work. The superior court ordered Jack to enroll in a domestic violence intervention program and the court put in place a temporary visitation schedule providing that Jack would see the children every Thursday from 3:30 p.m. to 8:00 p.m. when school was in session, 10:00 a.m. to 8:00 p.m. when school was not in session, and every Sunday from 10:00 a.m. to 8:00 p.m. The court noted that once Jack found suitable housing he could file a motion to modify custody.

### 2. Interim hearings

Between the December 2007 protective order hearing and the fall 2008 divorce trial, the parties each filed numerous motions and several hearings were held. These hearings addressed issues similar to those presently on appeal, including: (1) visitation; (2) Jack's desire to have the custody order from the domestic violence case modified; (3) ongoing harassment by Jack and general failure to communicate between the parties;[2] (4) Jack's failure to complete anger management courses as ordered by the trial court at the protective order hearing; (5) mental health treatment for the children, particularly Kaleb; (6) property division; and (7) scheduling activities for the children.

### 3. The custody investigator's findings

On April 10, 2008, the superior court ordered a full custody investigation to obtain recommendations regarding any custody modification that would be included in the final divorce order. The custody investigator issued his report on September 4, 2008, after meeting with Tally, Jack, and the children several times.[3]

The investigator primarily described Jack and Tally's relationship through reports from each side: "Mother reports Father was controlling and critical. She states she was the primary parent through the relationship.... Mother notes Father was manipulative and mentally abusive." On the other hand, "Father said there was a lot of yelling in the relationship. Father reports Mother had a drinking problem which remains an issue." Jack also alleged that Tally used drugs and drove while intoxicated. The investigator, however, found no evidence that Tally had "an addiction that impair[ed] her behavior." The custody investigator noted the parties' involvement with the Anchorage Police Department, including Jack's July 2007 arrest for breaking Tally's cell phone and Tally's October 2007 arrest for allegedly punching Jack in the mouth (charges related to this incident were later dropped). The investigator also spoke with the children's therapist. She indicated that all the children were "deeply stressed about the custody battle" and recommended that Kaleb receive further psychological evaluation at North Star, a behavioral health provider.

The custody investigator made several relevant findings and recommendations. He noted that "[t]he children need to be shielded from the parents' conflict." He indicated that both parents can meet the children's physical needs but found that Jack "would likely struggle more ... since his work has been sporadic and has taken him out of town." He emphasized the parents' communication issues, stating that Jack "appears to pressure the children and his obvious depressed mood likely affects the children.... [His] tendency to feel persecuted and always feel he is correct appears to make it hard for him [to] compromise and work with [Tally]." Similarly, he noted that Tally "has done things in front of the children that can easily be anticipated to cause conflict." He found that Tally "appears [cavalier] about ignoring court orders .... [and] these actions are provocative to [Jack] and put the children in the middle of even more conflict." Although he found no domestic violence, child abuse, or

---

**2.** Jack and Tally have had such serious communication problems that they do not talk on the telephone; at first they communicated by email, but text messages eventually became their primary means of communication.

**3.** The investigator noted that Jack had yet to complete parent information forms and that none of his references had responded to the investigator's inquiries. Tally completed her parent information forms and two of her references responded.

neglect present in either household, the investigator remarked that Jack's questioning and pressuring of the children was "inappropriate and harmful to the children." He found that Jack's repetitive calls to the police for welfare checks exposed the children to the parents' conflict and were "definitely harmful." He also noted that Jack had not completed his court-ordered anger management classes and "appears to have delayed starting until there were repercussions from the court." The investigator found that Jack presented as "depressed and overwhelmed. He appears to feel persecuted and makes many claims which he does not back up. . . . He asks for things he needs or wants as necessary for the children."

The custody investigator concluded that Tally "maintained a more stable home and work. She appears more stable psychologically." The investigator recommended that Tally have primary physical custody, but that Jack get the children three weekends out of every four once he completed anger management and his health was adequate. He also recommended that during the summer, custody be equally shared on a week on/week off basis. He recommended that the parents share legal custody and that each inform the other of important events in the children's lives—he felt that arrangement was the only way that one parent would not exclude the other from major parenting decisions. The investigator suggested that the children remain in counseling, that Jack get a psychological assessment to determine if therapy would be beneficial for him, and that Jack should follow all recommendations of the counselor. Finally, the investigator expressly recommended that neither parent speak negatively about the other nor question the children about the other parent.

#### 4. Fall 2008 divorce trial

Jack and Tally's divorce trial was held in fall of 2008. At the conclusion of the trial, Superior Court Judge Sharon Gleason awarded sole legal custody and primary physical custody of the children to Tally and kept Jack's visitation schedule from the December 2007 domestic violence case in place. In doing so, the court examined the statutory factors, in particular the relative ability of both parents to meet the children's needs and provide stability. The court confirmed that Jack had committed acts of domestic violence against Tally on at least two occasions, so the statutory presumption affecting custody applied.[4] Thus, the court required Jack to take an intervention program for batterers, which could be satisfied by completion of anger management classes, before gaining additional unsupervised visitation with the children.

The court also ordered both parents to take a minimum of eight parenting classes, finding that they were both responsible for putting their children in the middle of their conflict and noting the "risk of mental harm to the children because of their coerced participation in these adult issues." It echoed the sentiments of the custody investigator that Tally's drinking did not rise to a problematic level and that Jack's repeated calls to the police were much more traumatic for the children. Instead of following the custody investigator's suggestion to automatically change the visitation schedule upon Jack's completion of anger management courses, the court required Jack to return to court upon completing a psychological assessment and anger management classes if he wished to modify the visitation schedule. The court expressly noted that it rejected the custody investigator's suggestion because it wanted an update on each parent's progress with parenting classes and relationship with the other parent before modifying the existing custody schedule. It also ordered counseling for the children to continue and specified that Tally must give Jack 60 days notice if she wished to change the children's school.

#### 5. Jack's 2009 motion to modify custody

On August 28, 2009, Jack filed a motion to modify custody asking for shared legal custo-

---

**4.** *See* AS 25.24.150(g) ("There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child."). AS 25.24.150(h) defines "history of perpetrating domestic violence" and specifies ways in which the statutory presumption may be overcome.

dy because Tally was allegedly "making poor decisions" regarding the children and violating court orders, and he felt that he was entitled to 50/50 physical custody because he had met all the court's requirements. Tally opposed the motion, claiming that Jack had continued to harass her and there had been no substantial change in circumstances justifying a change. The matter was referred to Master Jonathan Lack in November 2009 and a hearing was scheduled for January 26, 2010.

Before the hearing on the motion to modify custody, the parties continued to have communication problems regarding the children. On September 21, 2009, a hearing was held in front of the master on Jack's motion to change the children's school. Jack alleged that he did not receive adequate notice before Kaleb was moved. Tally claimed that she had given Jack notice at the end of the previous school year, sending him a letter that she would allow Kaleb to attend a different school if he got his grades up at the German language school he had been attending with his brothers. The master took these issues under advisement.

At the January 26, 2010 hearing, Jack asked for a continuance on his motion for shared physical custody because he had reported Tally to the Office of Children's Services (OCS) for child abuse and called the Anchorage Police Department to report an assault on a child arising out of the same incident; Jack reported that both of these cases were still under investigation. Thus, instead of deciding the custody dispute, this hearing dealt with other issues between the parties including whether Jack's psychological evaluation was adequate, Kaleb's school problems, and visitation issues.

On April 27, 2010, the master held a hearing on Jack's motion to modify custody. Jack claimed that he had completed the "few issues [from the divorce order] that [he] needed to take care of in order to have the 50/50 custody." He also told the master that he had made a referral to OCS because he believed the children were being abused, but he did not have any witnesses from OCS appear at the hearing because they had temporarily closed the file pending the receipt of a report from the Anchorage Police Department. Tally's attorney later pointed out during cross-examination that the OCS case was closed because the allegations were unsubstantiated. Jack also asserted that Tally had not satisfied her obligation to complete child parenting classes. Lastly, Jack claimed that "the co-parenting issues .... are just running out of control," specifically regarding Kaleb's schooling and behavior outbursts, and visitation with the children.

Tally denied the claims of abuse and recounted what happened during the alleged abuse incident. She called her own expert to question the adequacy of Jack's psychological evaluation. She also maintained that she did complete the requisite parenting classes through an online program. She noted repeated problems involving Jack, including: when he took Kaleb to get his ear pierced; when he angrily confronted her attorney at the attorney's office; when he allegedly bumped her in the locker room at one of the children's hockey games; and ongoing behavioral problems with the children that she believed resulted from Jack's influence. The master took all of this information under advisement and indicated he would issue his report at a later date. Another hearing was held between the parties in front of the superior court in June 2010 in order to arrange summer travel.

The master issued his Report and Order in July 2010 and the superior court issued its final decision on the motion to modify custody in September 2010. In its order, the superior court adopted the findings and conclusions of the master with a few interlineations. The court found that there had been a change in circumstances and that both parties had substantially complied with its requirements from the November 2008 order. It then went through a best interests analysis, noting that "[b]ecause of the complete breakdown in the ability of the parties to effectively communicate, joint legal custody is not appropriate in this matter." While elaborating on the best interests factors, the court stated that it was clear that both parents loved their children. However, it also found both parents at fault for their substandard communication; "[Tally] does what

is minimally required to notify [Jack] of decisions regarding the children," but Jack's behavior in the locker room and especially at Tally's attorney's office was "unreasonable in light of the prior allegations in this matter and shows a lack of insight into his behavior." The superior court ordered that Tally maintain sole legal custody and primary physical custody of the three children. Jack was granted visitation one day during the school week and overnights on alternate weekends. No change for summer was found in this schedule. The court also laid out specific notice provisions if Tally wished to change the children's schools or take the children for medical or mental health treatment. The court set provisions for Tally to substitute visitation periods if the children had extracurricular activities that would take them out of state, and explicitly allowed Jack to attend school or extracurricular activities outside of his scheduled visitation time, provided he gained prior approval from the child's teacher and notified Tally.

Jack appeals the superior court's custody order.

## III. STANDARD OF REVIEW

■ A motion to modify custody is governed by AS 25.20.110, which provides that "[a]n award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification ... and the modification is in the best interests of the child." [5] "We will reverse a custody modification order only if the record shows an abuse of discretion or if controlling factual findings are clearly erroneous." [6] "An abuse of discretion in child custody awards occurs when the trial court considers improper factors,

fails to consider statutorily mandated factors, or gives too much weight to some factors." [7] Findings of fact will not be set aside unless clearly erroneous, which means that "a review of the record leaves us 'with the definite and firm conviction that the superior court has made a mistake.'" [8]

■ The findings of a master that are adopted by the superior court are considered the findings of that court.[9] "The trial court's factual findings enjoy particular deference when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence." [10]

## IV. DISCUSSION

### A. The Trial Court's Findings Of Fact Were Not Clearly Erroneous.

In its final custody order, the superior court largely adopted the Master's Report and Order, which contained: a section entitled "Findings of Fact," which summarized the information presented at the April 27, 2010 custody hearing before the master; a section entitled "Conclusions of Law," which tied additional specific facts to the statutory best interests factors; and a section entitled "Recommendations," which made specific recommendations regarding custody and visitation.

■ Jack argues that the superior court's "findings of fact section ... is entirely devoid of any coherently stated finding[s], much less ones that are stated 'specially' as required under Civil Rule 52." [11] He points out an "absence of numbered paragraphs" and believes that the mere summary of testimony

---

5. AS 25.20.110(a).

6. *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011) (quoting *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991)) (internal quotation marks omitted).

7. *Id.* (quoting *Long*, 816 P.2d at 150) (internal quotation marks omitted).

8. *Id.* (quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207–08 (Alaska 2000)); *see also* Alaska R. Civ. P. 52(a) ("Find-

ings of fact shall not be set aside unless clearly erroneous....").

9. Alaska R. Civ. P. 52(a).

10. *William P.*, 258 P.3d at 814 (quoting *Misyura v. Misyura*, 242 P.3d 1037, 1039 (Alaska 2010)) (internal quotation marks omitted).

11. Alaska Civil Rule 52(a) provides that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially."

presented at the April 2010 hearing leaves "the reader with no sense that any particular fact is being cited for any specific reason." Jack does acknowledge that the court made discrete findings of fact in the section entitled "Conclusions of Law," but he contends that the court's analysis regarding those additional facts was insufficient.

Tally responds that "[t]here is no finding referenced by the appellant as being a clearly erroneous finding." She argues that, while Jack disagrees with some of the conclusions drawn from the court's findings, his arguments effectively address the weight given to these findings rather than any alleged "impropriety." She then concludes that "given that the majority of the evidence placed before the court at the hearing was through oral testimony ..., the court's findings should be given 'particular deference.'"

The section of the court's report entitled "Findings of Fact," as Jack correctly points out, primarily summarizes the parties' respective presentations from the April 2010 hearing. In particular, the court identified facts regarding Jack and Tally's respective efforts to take child parenting classes, Jack's anger management classes, and Jack's psychological examination. Each of these findings was important to the court's conclusion that Jack and Tally had "substantially complied with the requirements outlined by Judge Gleason in November of 2008."

After finding changed circumstances, the court then conducted a best interests analysis pursuant to AS 25.24.150, which is set forth in the section entitled "Conclusions of Law." As Jack emphasizes, the court's best interests analysis references additional discrete findings of fact not included in the section entitled "Findings of Fact." In particular, these facts include that: the children all have difficulty in school; Kaleb in particular has "significant mental health issues" that need to be addressed; Tally is more in tune "to the children's mental health issues and has a greater desire to meet those needs"; Jack cannot separate himself from what occurs with the children and sees changes to the children's school and activities as attacks against him; both parents have "substantial love and affection for the children and the children love their parents"; there have been "significant upheavals" in the children's schooling, but these do not necessarily represent bad choices; the children may need more stability in their lives; Tally does "what is minimally required to notify [Jack] of decisions regarding the children" and the communication between Jack and Tally is "still, even when limited to email and text messaging, openly hostile"; Jack is "reactionary" to Tally's texts and her attempts to inform him of events in the children's lives; since the divorce "there has been no domestic violence, but the hostility and anger between the parties has not subsided"; the "failure of [Jack] to take every precaution to avoid physical contact with [Tally] reflects a complete lack of situational and historical awareness"; and the "numerous motions to modify the visitation schedule" and resulting "return to court to address these issues is placing exceptional strain on the parties, and ... is most likely negatively affecting the children."

Although Jack takes issue with the court's overall organizational scheme, he acknowledges that the court made numerous specific findings of fact. And as Tally correctly points out, Jack does not identify a single, specific finding as having been made in clear error—rather, Jack insists that the findings should have been stated more "coherently" or "specially." But the fact that the report was not drafted in a particular format does not constitute a basis for challenging the court's findings on appeal. Additionally, we agree with Tally that the majority of Jack's argument addresses the weight accorded specific findings of fact, rather than the factual findings themselves, and is therefore instead relevant to a consideration of the court's discretion. The superior court's findings are sufficient to allow us to discern what factors and considerations the court deemed important in ruling on Jack's motion to modify custody. We conclude that the superior court's findings were not clearly erroneous.

**B. The Superior Court Did Not Abuse Its Discretion In Making Its Final Custody Determination.**

■ Jack argues that the superior court incorrectly weighed its factual findings in

conducting its best interests analysis and then reached improper legal conclusions from the evidence presented. Jack effectively contends that the superior court abused its discretion by considering "improper factors," failing "to consider statutorily mandated factors," and giving "too much weight to some factors." [12]

Alaska Statute 25.24.150(c), which governs custody determinations, mandates that a court "determine custody in accordance with the best interests of the child." In determining custody the court must consider:

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child ...

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.[13]

In adopting the master's conclusions of law and ultimately his recommendations, the superior court identified each of the best interests factors and specifically analyzed each factor in turn. Based on its analysis of the enumerated factors, the superior court made its final custody determination. The court's custody determination ordered that Tally would continue to have sole legal custody of the three children, Tally would continue to have primary physical custody of the children, Jack would continue to have visitation on Thursdays, Jack would have alternate weekends from Friday at 6:00 p.m. to Sunday at 3:00 p.m., Jack and Tally could submit a proposed schedule for Thanksgiving and Christmas, Tally would be permitted to substitute visitation times, and Jack would be permitted to attend school and extra-curricular activities outside of his specified visitation times.

Jack advances a number of arguments that the superior court abused its discretion. Jack primarily contends that the superior court abused its discretion by failing to give consideration to the "very specific findings" of the 2008 custody investigation, which had recommended increased visitation with Jack, or to at least omit specific findings as to why the custody investigator's recommendations were no longer in the best interests of the children. Jack believes that the superior court made him "the equivalent of a judicial promise" in its 2008 divorce order and, now that he has completed the court's requirements, its failure to modify custody according to the investigator's report is a "grossly unjust and erroneous situation."

Regarding the court's specific best interests analysis, Jack argues that there are a number of facts that should have weighed more heavily in the court's determination, particularly in regard to the court's consideration of Jack's and Tally's respective capability and desire to meet the children's needs. These facts specifically include: the "significant upheavals" caused when Tally changed the children's schools; the court's conclusion that Tally's continuing to bring matters before the court was negatively affecting the children; the children, particularly Kaleb, performing poorly in school since Tally was granted full legal and primary physical custody; and Kaleb continuing to suffer significant mental health issues. In conclusion, Jack argues that "the facts developed ... in modifying the parties' custody order were woefully inadequate."

**12.** *See William P.,* 258 P.3d at 814.

**13.** AS 25.24.150(c).

Jack also defends certain actions he took that he feels the court characterized in a negative manner. In particular, Jack argues that: the fact he felt threatened by Tally's actions was warranted "[i]n light of the complete failure of the trial court over the ensuing course of years to do anything to [Tally] when he complained about her violations," the incident between Jack and Tally's attorney demonstrates Jack's recognition that his behavior needs to be controlled and channeled away from Tally, and the physical encounter between Jack and Tally in a locker room was merely an accidental touching.

Tally counters that the superior court did not abuse its discretion. She asserts that the "court appropriately made the necessary [f]indings of [f]act and considered the relevant statutory criteria to support the modified custody award issues."

The superior court did not abuse its discretion in issuing its custody modification order. The superior court properly identified the statutory best interests factors and then applied its factual findings to each enumerated factor. Although Jack disagrees with the court's analysis, the court's findings of fact are well supported by the evidence and the court's conclusions properly align with its stated findings. Overall, the court found the best interests factors favored leaving sole legal custody and primary physical custody with Tally, but the court did expand Jack's visitation by granting him alternate weekends, which included overnights on Friday and Saturday. Although Jack would characterize some of his actions differently, he has presented no evidence that the court considered improper factors, failed to consider the appropriate statutory factors, or improperly weighed the relative factors.

Much of Jack's argument focuses specifically on the custody investigator's report completed in September 2008, before the divorce trial had even occurred and well before the present motion to modify custody was filed. Jack's argument, however, fails to consider the proper focus of a motion to modify custody, which is statutorily required to focus on a *change* in prior circumstances before any modification to custody may be made.[14] Thus, the superior court properly focused on the parties' present circumstances. Moreover, since 2008 the parties have had frequent court involvement and it became apparent to the court that their inability to effectively communicate precluded any sort of joint custody award. Even the custody investigator recognized the importance of communication—testifying during the divorce trial that "if [Jack and Tally's] communication didn't improve and stayed the way it is now, in the future I might recommend differently, that it may not be possible for them to share legal custody." Moreover, the custody investigator also stated that his recommendations would be different if Jack did not learn to control his behavior. Jack's behavior since 2008 led the court to different conclusions than the custody investigator had originally recommended, and the superior court properly considered the parties' current circumstances.[15] Finally, we reject Jack's assertion that the superior court's prior statements amounted to a "judicial promise." Despite Jack's characterization otherwise, the superior court explicitly noted in 2008 that, if and when Jack returned to court, a best interests analysis would then be conducted. The superior court did not abuse its discretion.

### C. The Superior Court Failed To Adequately Explain Its Decision To Make No Change To Jack's Summer Visitation Schedule.

Jack challenges the "absence of any summer recommendation" in the superior court's September 2010 order. In its December 2007 Domestic Violence Protective Order, the superior court put in place a visitation schedule providing that Jack would have visitation every Thursday from 3:30 p.m. to

---

14. AS 25.20.110(a) provides that "[a]n award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child."

15. Nor was the superior court required to make any special findings regarding why the court chose not to follow the 2008 custody investigator's report.

8:00 p.m. when school was in session, from 10 a.m. to 8:00 p.m. when school was not in session, and every Sunday from 10:00 a.m. to 8:00 p.m. The court did not modify this visitation schedule in its order following the fall 2008 divorce trial. The superior court's September 2010 order put in place a visitation schedule providing that Jack would have visitation every Thursday from 4:00 p.m. to 8:00 p.m. and alternate weekends from Friday at 6:00 p.m. to Sunday at 3:00 p.m. The order did not provide for any changes to Jack's regular visitation schedule when school is not in session. Neither the superior court's order nor the record on appeal provides adequate explanation as to why the court's September 2010 visitation order failed to provide for any changes to Jack's visitation with the children when school is not in session, and it is possible that the lack of any such provision was merely an oversight. Because an adequate explanation regarding visitation when school is not in session does not appear in the record, we therefore remand to the superior court for further explanation on this one limited issue.

## V. CONCLUSION

Because the superior court's factual findings were not clearly erroneous, and because the superior court did not abuse its discretion in modifying custody, we AFFIRM the majority of the superior court's final custody order. But because the superior court did not explain why its final order provided no changes to the visitation schedule during the children's summer vacation, we REMAND to

the superior court for further explanation on this one limited issue.

STOWERS, Justice, concurring.

STOWERS, Justice, concurring.

Though I agree generally with the court's opinion, I conclude there is no requirement for the superior court to explain why it did not change the father's summer visitation. Under the superior court's custody order, the father will have visitation in the summer on the same schedule as the rest of the year. Given the facts of the case, can this court conclude that such a summer schedule is an abuse of discretion? I cannot. I understand that the court does not find an abuse of discretion, but the court apparently concludes some additional explanation by the superior court is necessary to evaluate whether the failure to modify the summer schedule was within the superior court's discretion. Again, I conclude that it was an acceptable exercise of discretion for the superior court not to modify the summer visitation schedule. In my view, no further explanation is required. But no harm arises from a remand order to provide the superior court with an opportunity to explain its thinking, so I do not dissent from the opinion.