This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                     **NO. 31,560**

**ANADASHA MASON,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**Louis P. McDonald, District Judge**

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Acting Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**VANZI, Judge.**

{1}     Defendant Anadasha Mason appeals from her convictions for attempted first degree murder, aggravated battery, and tampering with evidence. The State concedes that Defendant's convictions for both attempted murder and aggravated battery violate the prohibition against double jeopardy. We accept the State's concession but find no other error. Accordingly, we reverse and remand to the district court for the limited purpose of vacating Defendant's conviction for aggravated battery.

**BACKGROUND**

{2}     Defendant and her husband, Kirk Mason, (Husband) married on February 14, 2000, after meeting online. They lived together at Husband's house in Rio Rancho with their two large dogs. On January 19, 2009, Defendant called 911 to report that Husband had been shot by an intruder who broke into their house. When the police officers arrived on scene, they did not see evidence of an interrupted burglary or home invasion. The front door was slightly ajar, but there were no signs of forced entry. The house was "in a neat order[.]" "Nothing appeared to be . . . turned over [or] ransacked[.]" Defendant "appeared calm" and did not appear to have been crying. The officers found Husband in bed with a gunshot wound to his head. He was surrounded by "[a] lot of blood" that "looked like it had coagulated." There was a Derringer handgun on the floor in the bedroom and another handgun on the dresser. Emergency personnel transported Husband to the hospital, where he underwent surgery. He survived the shooting but suffers from right-side weakness, sensation

deficits, and problems understanding and expressing language. The injuries are "fairly profound."

{3} Defendant told the police that she had woken up at approximately 7:00 a.m. and let the dogs out. She then went to the bathroom to put in her contacts. She heard a loud bang, exited the bathroom, and noticed that Husband had been shot.

{4} Officers found a number of items in the home that were suspicious. Outside the front door, there was a pink pillowcase that contained a bottle of Crown Royal, a camera, and a set of silver. These items had been stored in various locations in the house. The liquor cabinet was undisturbed apart from the missing bottle of Crown Royal. In addition, the officers discovered that the pink pillowcase came from a set in the hallway linen closet. The other items in the set were "neat, organized" and appeared to have been undisturbed.

{5} Next to the front door was a trash can containing a wooden drawer to a jewelry box and some DVDs. Defendant's purse was on the dining room table, untouched. There was a note on the kitchen counter that read, "You're next, Kirk." The officers saw a wet newspaper and some rags on the kitchen counter. Defendant stated she had been using Brasso to clean silver the night before the shooting, but the officers testified that it smelled like gun cleaning solution, not Brasso. In addition, Brasso is generally used to clean brass, not silver, and officers were never able to locate any Brasso in the house. The officers did, however, find a trash can outside of the house

that "had a very strong, pungent odor . . . [of] gun cleaning oil," but the trash can had been emptied prior to the search.

{6} While Defendant claimed that she had heard a gunshot while putting her contacts in, there was no contact case or contact lens solution on the bathroom counter. The bathroom was "fairly neat, clean" and did not appear to have been used. Officers searched the dresser in the bedroom and found credit card statements in a drawer "hidden underneath [women's] clothing." The credit card statements reflected outstanding balances totaling $54,820.11. The police learned that Husband worked as a dealer at Santa Ana Star Casino for a number of years and was a frugal person. He never used credit cards but always gave money to Defendant if she needed it.

{7} After Husband was transported to the hospital, the police decided they needed to talk to Defendant. Officer Robert Cordova was transporting Defendant to the hospital but, at the request of Detective Michael Applegate, transported Defendant to the Rio Rancho police station instead. At the police station, Defendant spoke with Detectives Applegate and Buhl. Defendant described what had happened at the house and described approximately seven prior incidents involving an alleged stalker, all of which she had previously reported to the police.

{8} On December 10, 2008, five weeks prior to the shooting, Defendant called the police to report that someone had spray painted the word "Thief" on the hood of a vehicle parked in her and Husband's driveway. On that same day, Defendant filed a

4

police report claiming she had been harassed at a Wal-Mart store. Defendant claimed that a Hispanic male approached her, grabbed her arm, and asked her whether she was "the wife of [a] thief[.]" Defendant later prepared a written report of this incident, describing the suspect as having a "scar above his left eye" and wearing jeans and boots. Defendant reported that she was approached by this same man at Kohl's on December 26, 2008. The loss prevention manager at Wal-Mart reviewed surveillance video from the date of the alleged incident and could not substantiate Defendant's claim. The manager at Kohl's investigated Defendant's report and determined it "never occurred."

{9} On January 4, 2009, Defendant called the police to report a suspicious person in her backyard. She stated that she was in her house, heard her dogs growl, and looked out the kitchen window, where she saw a man staring at her. She stated that the man ran through the backyard, over the back wall, and out of the yard. Officers found prints from cowboy boots in the backyard. The prints were located throughout the yard going up to a wall, but no prints were located on the other side of the wall.

{10} On January 6, 2009, Defendant reported that her vehicle was damaged while parked in the garage of the casino where Husband worked. Employees at the casino reviewed surveillance videotape of the garage "but . . . could not find anything that would substantiate the complaint." Casino employees also reviewed surveillance videotape of the table where Husband worked and could not substantiate reports that

5

Husband was involved in any sort of disturbance while at work. Husband never reported any disturbance to the casino; the reports came only from Defendant.

{11} On January 7, 2009, Defendant called the police to report that someone had broken into her car while it was parked in the garage at her house and had stolen a Derringer handgun and a whiskey flask from the center console. A police officer responding to the scene observed that the passenger's side door of Defendant's car was open, but the officer noted that because of the vehicle's location in the garage, it "would have been very difficult" for someone to access the center console from the passenger side. The police were not able to locate any fingerprints. Defendant informed the police that she believed the suspect might be a disgruntled gambler because Husband worked at the casino.

{12} On January 15, 2009, Defendant called the police to report that an individual had shot at her from the rear of her house. Defendant described the stalker as a Hispanic male, approximately 5'10" tall, wearing cowboy boots. The police could not find any shell casings or other metal objects in the backyard. They did find some prints from "very small and narrow" cowboy boots. The officers conducted a neighborhood canvass, but the majority of people to whom they spoke did not hear or see anything. One person said he heard a gunshot but did not see anything. On January 17, 2009, Defendant contacted the police to report that she had found a note

6

and bullet casing on the front porch of her and Husband's house. The note said, "UR next, Kirk."

{13} Defendant discussed these events with Detectives Applegate and Buhl for approximately twenty minutes. Detective Applegate believed the events Defendant was describing were not "making sense" and asked Detective Buhl to advise Defendant of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant waived her rights and executed a written waiver. Defendant was then questioned for approximately one hour. The detectives believed Defendant "was not being truthful" and "was somehow responsible[.]" However, Defendant was not arrested at that time. At the conclusion of the interview, the police gave Defendant a ride to a friend's house.

{14} Approximately two weeks after Husband was shot, Defendant provided the police with a list of items that she claimed were stolen by the intruder on January 19, 2009. This list contained a lot of electronic equipment, including laptop computers and computer games, some of which were identified by serial numbers. The police contacted the various manufacturers of the items identified with serial numbers and learned from every manufacturer that the serial numbers were not valid—that is, the serial numbers had never been issued. When Defendant was ultimately arrested, approximately six months after the shooting, she had $9,000 cash in her purse.

7

**{15}** On July 10, 2009, Defendant was charged by criminal information with attempt to commit first degree murder (willful or deliberate) and tampering with evidence. As an alternate to Count One, Defendant was charged with aggravated battery with a deadly weapon. Defendant filed a motion to suppress on January 29, 2010. She argued that the statements she made to the police officers on or about January 19, 2009, should be suppressed because, among other things, she "was not properly advised of her Constitutional right[s]" and "did not knowingly, intelligently, and voluntarily" waive those rights prior to being questioned. She filed an amended motion on September 29, 2010, arguing that she "did not knowingly, intelligently, and voluntarily waive her Constitutional rights prior to the beginning of any questioning by police officers due to various medications Defendant was taking at the time of questioning."

**{16}** The district court held a hearing on Defendant's motion on January 27, 2011. The issue at the hearing was whether Defendant knowingly, intelligently, and voluntarily waived her rights pursuant to *Miranda*. Detectives Buhl and Applegate testified for the State, and the district court reviewed the written transcript of Defendant's interview and a videotaped recording of the interview. The district court found that Defendant knowingly, intelligently, and voluntarily waived her rights and, on that basis, denied her motion to suppress.

8

{17} A jury trial began on February 7, 2011. Husband was one of many witnesses who testified for the State. The prosecutor showed Husband the bills that had been found in the bedroom dresser, and he stated he had never seen them before and was not aware of them. Husband testified that he had a life insurance policy for one hundred thousand dollars and Defendant knew about the policy. Husband testified that on the day he was shot, only he and Defendant were in the house. He said that Defendant had asked him to tell the police that someone else was in the house and he had done so previously, but this was not true and "it [was] not right because [he did not] see anybody." Husband also testified that no one at the casino was angry with him.

{18} The jury found Defendant guilty of attempted first degree murder as charged in Count One, aggravated battery (deadly weapon) as charged in the alternate to Count One, and tampering with evidence as charged in Count Two. At sentencing, the State agreed with the district court that the aggravated battery conviction "merged into" the attempted first degree murder conviction. The district court sentenced Defendant to nine years imprisonment for attempted first degree murder with a one-year firearm enhancement, and three years imprisonment for tampering with evidence, for a total term of thirteen years imprisonment.

**DISCUSSION**

**{19}** Defendant raises four issues on appeal. First, she contends her convictions for attempted murder and aggravated battery violate the prohibition against double jeopardy. Second, she contends the district court erred in denying her motion to suppress the statements she made to the police on the day of the shooting because she was not properly advised of her *Miranda* rights. Third, she contends the jury instruction on tampering with evidence was erroneous because it failed to identify the evidence with which she allegedly tampered. Fourth, she argues there was insufficient evidence to support her convictions.

## A.    Double Jeopardy

**{20}** Defendant contends her convictions for attempted murder and aggravated battery, which were charged as alternative counts based on the same conduct, violate the prohibition against double jeopardy. At sentencing, the district court referred to the aggravated battery conviction as merging with the attempted murder conviction, but the State concedes that, "to remedy a double jeopardy violation, merger is insufficient, and the conviction must be vacated." Because we are not required to accept the State's concession, *see State v. Guerra*, 2012-NMSC-027, ¶ 9, 284 P.3d 1076, we independently review the merits of Defendant's argument.

**{21}** The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, made applicable to New Mexico by the Fourteenth Amendment, "functions in part to protect a criminal defendant against multiple punishments for the

same offense." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747 (internal quotation marks and citation omitted). In a double-description case, the same conduct results in multiple convictions under different statutes, which violates the prohibition against double jeopardy. *Id.* A defendant can raise a double jeopardy claim at any stage of a criminal prosecution, *see State v. Jackson*, 1993-NMCA-092, ¶ 12, 116 N.M. 130, 860 P.2d 772, and we review double jeopardy claims de novo. *Swick*, 2012-NMSC-018, ¶ 10.

{22} In *Swick*, our Supreme Court overruled *State v. Armendariz*, 2006-NMSC-036, ¶ 31, 140 N.M. 182, 141 P.3d 526, and held that where a defendant is convicted of attempted murder and aggravated battery based on the same conduct, the convictions violate the protections against double jeopardy. *Swick*, 2012-NMSC-018, ¶¶ 19-20, 27. The remedy for this double jeopardy violation is to vacate the conviction that carries the lesser punishment. *Id.* ¶ 31.

{23} Here, the district court recognized that Defendant could not be sentenced for both attempted first degree murder and aggravated battery, but the district court did not vacate the aggravated battery conviction. Instead, the district court concluded that the aggravated battery conviction merged with the attempted murder conviction. This was error. *See State v. Schoonmaker*, 2008-NMSC-010, ¶ 50, 143 N.M. 373, 176 P.3d 1105 (holding that, to remedy the imposition of impermissible multiple punishments for a single offense, "the district court was required not only to 'merge' [the

d]efendant's convictions on alternative counts . . . but to vacate one of those alternative convictions; simply sentencing [the d]efendant for only one conviction was not enough").

{24} Accordingly, we remand to the district court for the limited purpose of vacating Defendant's conviction for aggravated battery. The district court does not need to resentence Defendant because Defendant was not sentenced for aggravated battery.

**B.     Motion to Suppress**

{25} Defendant contends the district court erred in denying her motion to suppress because: (1) the statements she made prior to being advised of her *Miranda* rights were made "under the pressure of custodial interrogation"; (2) the statements she made after being advised of her *Miranda* rights were the result of an invalid "question first" technique; and (3) all of the statements she made were involuntary "due to her debilitated mental state and because the detectives' conduct constituted overreaching."

{26} In reviewing the grant or denial of a motion to suppress, "[w]e consider the facts in the light most favorable to the prevailing party and defer to the district court's findings of fact if those findings are supported by substantial evidence." *State v. Anaya*, 2008-NMCA-020, ¶ 5, 143 N.M. 431, 176 P.3d 1163. To the extent that we must consider the district court's application of the law to the facts, our review is de novo. *State v. Hubble*, 2009-NMSC-014, ¶ 5, 146 N.M. 70, 206 P.3d 579.

12

**{27}** As an initial matter, the State argues that Defendant did not preserve or forfeited most of the arguments that she now seeks to raise. We agree. "In order to preserve an error for appeal, it is essential that the ground or grounds of the objection or motion be made with sufficient specificity to alert the mind of the [district] court to the claimed error or errors, and that a ruling thereon then be invoked." *State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (internal quotation marks and citation omitted); *see* Rule 12-216(A) NMRA (stating, in pertinent part, that "[t]o preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked"). The purpose of this requirement is "(1) to alert the [district] court to a claim of error so that it has an opportunity to correct any mistake, and (2) to give the opposing party a fair opportunity to respond and show why the court should rule against the objector." *State v. Gomez*, 1997-NMSC-006, ¶ 29, 122 N.M. 777, 932 P.2d 1. In the context of a motion to suppress, a party must alert the district court to the particular theory upon which he or she is relying. *See State v. Janzen*, 2007-NMCA-134, ¶ 11, 142 N.M. 638, 168 P.3d 768.

**{28}** The transcript of the suppression hearing reflects that the issue before the district court was whether Defendant's waiver of her *Miranda* rights was effective. Counsel for Defendant framed the issue as whether Defendant waived her rights in a voluntary and knowing fashion. He stated he felt like he had to raise the issue because Defendant was taking three prescription drugs. Counsel conceded that Defendant was

13

not subjected to a custodial interrogation. He did mention in passing that it concerned him that Defendant "[was not] *Mirandized* from the beginning," but this was not the basis of his motion. In denying Defendant's motion, the district court explained:

> Based on the testimony and my view of the video . . . I find by a preponderance of the evidence that [Defendant] was lucid, coherent, and capable of understanding the nature of her right to remain silent and the consequences of that waiver, and I find that she made the waiver knowingly and voluntarily.

{29} We will consider only whether the district court erred in concluding that Defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights, because this is the only argument that Defendant preserved in the district court. "In determining whether a waiver of rights is knowing, intelligent, and voluntary, we assess the totality of circumstances." *State v. Barrera*, 2001-NMSC-014, ¶ 23, 130 N.M. 227, 22 P.3d 1177.

{30} "In order to be voluntary, [a d]efendant's statement must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* ¶ 27 (internal quotation marks and citation omitted). Defendant did not argue in the district court that the detectives intimidated, coerced, or deceived her into waiving her *Miranda* rights, and we thus do not consider any argument with respect to this issue on appeal. Our Supreme Court has held that, "[a]bsent governmental overreaching or police coercion, a waiver of *Miranda* rights is voluntary for purposes of a Fifth

14

Amendment inquiry." *Barrera*, 2001-NMSC-014, ¶ 27. We thus reject Defendant's claim that the State failed to establish that her waiver of rights was voluntary.

{31} We next consider whether Defendant's waiver was knowing and intelligent. "In order for a waiver to be knowing and intelligent, it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* ¶ 28 (internal quotation marks and citation omitted). Defendant claims her waiver was not knowing and intelligent because she took a muscle relaxer, a sleep medication, and "about six Vicodin" on the night before she was questioned.

{32} The record reflects that Detective Applegate reviewed the waiver of rights form with Defendant, and Defendant said that she understood her rights and initialed and signed the waiver form. Detective Applegate testified at the suppression hearing that Defendant was "perfectly capable" of answering questions. Detective Buhl testified at the suppression hearing that Defendant did not appear to be intoxicated or impaired in any way. Defendant did not present any evidence that the medications she had taken on the night before she was questioned affected her ability to understand the contents and consequences of her waiver. In light of this evidence, we perceive no error in the district court's conclusion that Defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights, and we affirm the denial of Defendant's motion to suppress.

## C.   Jury Instruction

{33}   Defendant contends her conviction for tampering with evidence should be reversed because the jury instruction on tampering with evidence was erroneous.  The jury was instructed that, to find Defendant guilty of tampering with evidence, the State had to prove the following elements beyond a reasonable doubt:

1.   [D]efendant fabricated physical evidence by staging the crime scene;

2.   [D]efendant intended to prevent the apprehension, prosecution or conviction of herself;

3.   This happened in New Mexico on or about the 19th day of January, 2009.

Defendant contends the instruction was erroneous because it failed to identify the evidence with which Defendant allegedly tampered.  Defendant argues that "[t]he language of the jury instruction was so open-ended that if the jury believed [Defendant] falsified a report of the stalker, [then] she could be guilty of tampering with evidence."

{34}   Where, as here, a defendant does not object to an instruction in the district court, we only review for fundamental error.  *State v. Cunningham*, 2000-NMSC-009, ¶¶ 8, 11, 128 N.M. 711, 998 P.2d 176.  In a fundamental error analysis, "[o]ur task is to determine whether a reasonable juror would have been confused or misdirected by the jury instruction."  *Id.* ¶ 14 (internal quotation marks and citation omitted).

16

{35} As an initial matter, the State contends that Defendant is not entitled to relief because she invited the claimed error. The instruction originally stated that the jury had to find that Defendant fabricated evidence by "staging a crime scene and/or wiping the handgun[.]" After the district court denied Defendant's motion for a directed verdict on the charge of tampering with evidence, the district court held a bench conference off the record. At the conclusion of the bench conference, the parties and the district court agreed to modify the tampering instruction to remove "and/or wiping the handgun" from the instruction. Defendant did not object to the modified instruction.

{36} We have held that "to allow a defendant to invite error and to subsequently complain about that very error would subvert the orderly and equitable administration of justice." *State v. Collins*, 2007-NMCA-106, ¶ 27, 142 N.M. 419, 166 P.3d 480 (alteration, internal quotation marks, and citation omitted). However, it is not clear from the record that Defendant requested the change in the jury instruction. It appears that the district court decided to change the jury instruction after the prosecutor stated that she "would like to ask a question . . . off the record." We thus consider the merits of Defendant's argument.

{37} The State contends the jury instruction was not erroneous because the term "crime scene" is not an element of the offense and a definitional instruction was not necessary because the term has a commonly understood meaning and was used in

17

accordance with that meaning. We agree. In *State v. Gonzales*, our Supreme Court explained that, as a general matter, "definitional instructions are not required when the terms [in a jury instruction] are used in their ordinary sense." 1991-NMSC-075, ¶ 30, 112 N.M. 544, 817 P.2d 1186. The *Gonzales* Court found no error in a jury instruction where the terms used in the instruction (help, cause, and encourage) are words with common meanings. *Id.*

{38}    Similarly here, we conclude that the term "crime scene" has a common meaning and did not require definition. Defendant was not charged with any crimes arising out of her reports of any stalking incidents. Consequently, evidence relating to Defendant's filing of those reports could not have been evidence that Defendant fabricated at a "crime scene." It is clear that the reference to "crime scene" was a reference to Defendant's and Husband's house on the day Husband was shot. Because we conclude that a reasonable jury could not have been confused or misled by the instruction as given, the district court did not commit fundamental error.

**D.    Sufficiency of the Evidence**

{39}    Defendant argues there was insufficient evidence to support her convictions for attempted first degree murder, aggravated battery, and tampering with evidence. She cites *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, in support of her argument. We note that we have already held that Defendant's conviction for aggravated battery

18

must be vacated, so we do not consider whether the evidence was sufficient to support Defendant's conviction on this count.

{40} "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Cunningham*, 2000-NMSC-009, ¶ 26. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (alteration, internal quotation marks, and citation omitted).

{41} Defendant was convicted of attempted first degree murder in violation of NMSA 1978, Section 30-28-1(A) (1963), and NMSA 1978, Section 30-2-1(A) (1994). First degree murder is defined, in pertinent part, as "the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing[.]" Section 30-2-1(A)(1). Attempt to commit a felony is defined as "an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission." Section 30-28-1.

{42} Defendant was also convicted of tampering with evidence in violation of NMSA 1978, Section 30-22-5 (2003). Tampering with evidence is defined as "destroying, changing, hiding, placing or fabricating any physical evidence with intent

to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A).

{43} Defendant contends there was insufficient evidence to support her convictions for attempted first degree murder and tampering with evidence because she and Husband had "documented problems . . . with a stalker prior to the shooting" and the police officers "inadequately investigated the stalking incidents." While we agree that Defendant reported multiple incidents involving an alleged stalker, there was evidence that the police investigated these incidents and could not substantiate any of them. Among other things, surveillance video recordings reflected that there was no stalker at Wal-Mart, no stalker at Kohl's, and no stalker in the casino parking garage. In addition, police officers found cowboy boot prints in Defendant's backyard, allegedly from the stalker who jumped over the back wall, but the prints did not continue on the other side of that back wall. The police officer who responded to the alleged theft from Defendant's vehicle noted it "would have been very difficult" for someone to access the center console from the passenger side. After the shooting, Defendant provided the police with a list of items that she claimed were stolen on the day of the shooting, but the serial numbers that Defendant provided were fabricated.

{44} Defendant also claims the evidence was insufficient because the police did not test the newspaper and rags found on the kitchen counter to determine whether they were soaked with gun cleaner, as the State argued, or Brasso, as she claimed. All of

20

the officers who testified about the newspaper and rags said they smelled like gun cleaning solution, not Brasso. In addition, though Defendant claimed she was using Brasso to clean silver on the night before Husband was shot, there was testimony that Brasso is used to clean brass, not silver, and no Brasso was ever found in the house. There was testimony that the trash can outside Defendant's house smelled strongly of gun cleaner, but the trash had been collected on the day of the shooting, so officers were not able to observe the contents.

{45} While we agree, in theory, that the State could have presented additional evidence that there was never a stalker and that Defendant was cleaning a gun and not polishing silver on the night before the shooting, we do not hesitate to conclude that the State presented sufficient evidence to support the jury's verdict. There was evidence that Defendant deliberately intended to kill Husband on January 19, 2009, shot Husband in the head, but failed to kill him. There was evidence that both before and after the shooting, Defendant fabricated physical evidence by staging the crime scene so that it appeared that Husband was shot by an intruder, intending to prevent her apprehension, prosecution, or conviction for the crime. Defendant has consistently maintained her innocence, but "[t]he fact finder may reject [a] defendant's version of the incident." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. We do not substitute our judgment for that of the jury, but determine only whether the evidence was sufficient to support the jury's verdict. *Id.* We conclude

that it was and thus affirm Defendant's conviction for attempted first degree murder and tampering with evidence.

**CONCLUSION**

{46}     Because we conclude that Defendant cannot be convicted for both attempted first degree murder and aggravated battery, we remand to the district court for the limited purpose of vacating Defendant's conviction for aggravated battery.  In all other respects, we conclude that no error exists and affirm Defendant's conviction for attempted first degree murder and tampering with evidence.

{47}     **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**JONATHAN B. SUTIN, Judge**