2001-NMSC-014

22 P.3d 1177

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Mario Perez BARRERA, Defendant–
Appellant.**

No. 25,347.

Supreme Court of New Mexico.

April 19, 2001.

Law Office of John McCall, John A. McCall, Albuquerque, NM, for Appellant.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

SERNA, Chief Justice.

{1} Defendant Mario Perez Barrera appeals his convictions for first degree murder, armed robbery, shooting at an occupied vehicle, and felon in possession of a firearm. *See* Rule 12–102(A)(1) NMRA 2001 (appeals from sentence of life imprisonment taken to the Supreme Court). Defendant asserts four errors on appeal: (1) whether the trial court abused its discretion by denying his motion to grant a change in venue based on pretrial publicity; (2) whether the trial court erred in allowing Defendant's statement into evidence; (3) whether the trial court erred by admitting evidence which the prosecution did not produce until trial; and (4) whether sentencing for both murder and armed robbery constituted a double jeopardy violation. We affirm Defendant's convictions.

## I. Facts and Background

{2} On the morning of July 28, 1997, Wendy Wagner, the victim, drove to the Glorieta exit of Interstate 25 near Santa Fe, and got out of her red Dodge Ram pickup truck to remove a sign. Defendant had been situated at the exit for a period of time after hitchhiking from Albuquerque. Initially, he had traveled from his home in Colorado to Albuquerque with two individuals, Brian Martinez and Angela Aguilar, but they had a disagreement, and he parted ways with them in Albuquerque. When Defendant saw the victim leave her vehicle, he decided to steal her truck and tried to get to the vehicle before she could return to it. She reached the truck before he did, but Defendant approached the driver's side door and held it open; he asked, and then insisted, that she give him a ride. The victim began to scream, so Defendant shot her three times with his .22 caliber Jennings automatic pistol. The medical examiner testified that a shot to the victim's head instantly killed her.

{3} Defendant then got into the truck, pushed the victim's body down onto the floorboards, and drove out of New Mexico. Defendant eventually stopped in Oklahoma, pulled the victim out of the truck, and attempted to clean the blood off of the interior. Defendant removed some of the victim's possessions which were later found by the police in his dresser drawer. Defendant placed a WD–40–soaked cloth over the victim's head and set it on fire.

{4} Gilberto Velasquez, a coworker of Defendant's, testified that Defendant asked for his assistance to move a truck, explaining that he wanted to deliver it to a friend in La Junta. Velasquez testified that he followed Defendant as Defendant drove a red truck to La Junta; Defendant did not find the individual he described as his friend and abandoned the truck. The police located the truck in La Junta, Colorado, on August 6.

{5} Martinez and Aguilar went to the police with information regarding the murder on August 7, the day they heard that investigators found a red truck in Colorado. On August 11, Defendant was arrested. Police found a .22 caliber Jennings automatic weapon in the back seat of a police car in which Defendant was conveyed after his arrest. Police had not transported anyone else in that car since it had last been inspected. Defendant had two partially loaded clips for a Jennings .22 caliber automatic gun in his possession when he was arrested. Ballistic tests indicated that Defendant's .22 automatic was used to discharge the .22 caliber casings found at the Glorieta exit and the casing found in the truck following the murder. An expert witness testified that the victim was killed with a bullet fired from a .22 caliber gun, but could not establish that the bullets recovered from her body were fired from Defendant's .22 caliber gun.

{6} Pursuant to a search warrant, authorities recovered the victim's earrings, pendant, inscribed ring, and watch at Defendant's residence in his dresser. Investigators found a blanket which the victim regularly carried in her truck at Defendant's residence, placed under his mattress. A flashlight identical to one the victim also kept in her truck was found in Defendant's garage; DNA tests from blood on the flashlight were consistent with the victim's DNA. Defendant's fingerprints were found on a beer bottle located in the victim's truck following the murder.

{7} Defendant gave a detailed statement to FBI Special Agent Neil Hoener on August

following his arrest. Defendant stated that he saw a woman get out of a truck to remove a sign from a post at the Glorieta exit of I–25. He said that he thought he could get into the truck before she did, but that she got to it first. He admitted that he wanted the truck and that he shot her. Defendant said that she screamed and he shot her a second time, and that she kept screaming, so Defendant shot her again in the head. He got into her truck and drove away; Defendant described disposing of her body, cleaning the truck, and taking some of her possessions.

{8} Martinez testified that Defendant gave him an onyx and diamond ring which was identified as belonging to the victim. Martinez testified that, on August 6, Defendant admitted to him that he had shot a woman he saw taking down a sign and had taken her red truck with a New Mexico license plate, eventually leaving the truck in La Junta. Aguilar testified that she was present at the time Defendant admitted to Martinez that he had shot a woman and that she also heard Defendant's admission.

{9} The jury convicted Defendant, by general verdict, of first degree murder, as well as armed robbery, shooting at an occupied motor vehicle, and felon in possession of a firearm. The trial court sentenced Defendant to life imprisonment plus twenty-two and one-half years.

## II. Discussion

### A. Venue

{10} Defendant argues that the trial court erred by denying his motion to change venue. He contends that he could not receive a fair trial in Santa Fe County due to the publicity regarding the murder and the prominence of the victim, a fire fighter and member of an emergency medical team. Defendant notes that he preserved this issue through his motion to change venue, as well as during voir dire.

{11} This Court reviews a grant or denial of a motion for change of venue under an abuse of discretion standard. *State v. House*, 1999–NMSC–014, ¶ 31, 127 N.M. 151, 978 P.2d 967, *cert. denied*, 528 U.S. 894, 120

S.Ct. 222, 145 L.Ed.2d 186 (1999). "The trial court's discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated." *Id.* "The burden of establishing an abuse of discretion is borne by the party that opposes the trial court's venue decision." *Id.* As the party opposing the trial court's venue decision, it is Defendant's burden to establish an abuse of discretion.

{12} "The standard of review required in assessing most abuse-of-discretion claims is whether the trial court's venue determination is supported by substantial evidence in the record." *Id.* ¶ 32. Substantial evidence consists of relevant evidence that might be accepted by a reasonable mind as adequate to support a conclusion. *Id.* This Court resolves all disputed facts and draws all reasonable inferences in favor of the successful party and disregards all evidence and inferences to the contrary, viewing the evidence in the light most favorable to the trial court's decision. *Id.* "We must be mindful that it is the role of the trial court, and not the appellate court, to weigh the evidence and determine the credibility of witnesses." *Id.* ¶ 33. We do not substitute our own judgment for a determination of the trial court supported by substantial evidence. *Id.*

{13} The standard for change of venue, found in NMSA 1978, § 38-3-3(A)(2) (1965), provides:

> The venue in all civil and criminal cases shall be changed, upon motion, to some county free from exception:
>
> when the party moving for a change files in the case an affidavit of himself [or herself], his [or her] agent or attorney, that he [or she] believes he [or she] cannot obtain a fair trial in the county in which the case is pending because:
>
> . . .
>
> (b) the inhabitants of the county are prejudiced against the party; or
>
> (c) because of public excitement or local prejudice in the county in regard to the case or the questions involved therein, an impartial jury cannot be obtained in the county to try the case. . . .

In *House*, we discussed the distinctions between actual prejudice and presumed prejudice regarding prospective jurors.

> Actual prejudice requires a direct investigation into the attitudes of potential jurors. Under this inquiry, the court will conduct a voir dire of prospective jurors to establish whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible. Presumed prejudice, on the other hand, addresses the effect of publicity about a crime upon the entire community where the trial takes place. Under this inquiry, a change of venue should be granted if evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted.

*House*, 1999–NMSC–014, ¶ 46, 127 N.M. 151, 978 P.2d 967 (citation omitted). As noted by this Court, "[h]owever, the same standard of review applies to the trial court's decision—a determination based upon substantial evidence in the record—whether a venue change is based upon presumed or actual prejudice." *Id.*

{14} Defendant argues that he presented substantial evidence to the trial court regarding prejudice of the jury venire in Santa Fe County which demonstrated that an impartial jury could not be obtained; thus, he believes that he met the standard articulated in *House*. However, the question for this Court is whether the trial court abused its discretion by denying Defendant's motion to change venue, not whether Defendant presented substantial evidence regarding prejudice to the trial court.

{15} We note that in *House*, 1999–NMSC–014, ¶ ¶ 16, 20, 127 N.M. 151, 978 P.2d 967, the state moved for a change of venue, which the trial court granted. The defendant in *House* argued that the trial court abused its discretion by applying a presumed prejudice standard instead of an actual prejudice standard through voir dire. *Id.* ¶ 47. This Court concluded that a trial court, in its discretion, may rely upon presumed prejudice without conducting voir dire when other evidence persuades the trial court that pretrial publicity has rendered a fair trial improbable. *Id.* ¶ 54.

{16} Thus, a trial court may decide to change venue based on presumed prejudice if the requisite standard is met by the moving party. *Id.* However, if the trial court determines that a movant has not demonstrated presumed prejudice and proceeds with voir dire, we will limit our review to the evidence of actual prejudice. A finding of no actual prejudice following voir dire, if supported by substantial evidence, necessarily precludes a finding of presumed prejudice. "[T]he choice of waiting until after voir dire before granting a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *See House*, 1999–NMSC–014, ¶ 55, 127 N.M. 151, 978 P.2d 967.

{17} Defendant observes that a newspaper published information from his confession and argues that many potential jurors were convinced of his guilt prior to trial. Defendant also relies on an unscientific poll conducted on his behalf, which he contends should have been sufficient to convince the judge that the case should be moved. The State agrees that this case was the subject of many news reports and that some members of the venire were aware of the case. However, as recognized by this Court in *House*, 1999–NMSC–014, ¶ 51, 127 N.M. 151, 978 P.2d 967, "[g]iven the state of modern communications, it is not only unnecessary, but realistically impossible to expect jurors to be totally ignorant of the facts and issues of a case."

{18} Defendant misapprehends *House*. For the Court to do as he requests, we would have to reweigh the evidence. Again, as the State argues, the issue is not whether Defendant presented substantial evidence to the trial court that prejudice could be presumed, but whether substantial evidence supports the trial court's decision that an impartial jury could be obtained in Santa Fe County. In *State v. Chamberlain*, 112 N.M. 723, 726, 819 P.2d 673, 676 (1991), we addressed a change of venue argument similar to Defendant's, in which the appellant argued that extensive publicity had exposed potential jurors to information regarding the

case. "Exposure of venire members to publicity about a case by itself does not establish prejudice or create a presumption of prejudice." *Id.* The Court held that "the pertinent inquiry is whether 'the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Id.* (quoting *State v. McGuire,* 110 N.M. 304, 311, 795 P.2d 996, 1003 (1990) (internal quotation marks and quoted authority omitted)). We concluded that "[t]he [trial] court determined through voir dire that the jurors, although they may have heard of the case, were not incapable of impartiality. More is not required. Appellant has not carried his burden, and we affirm." *Id.* In the present case, those individuals actually selected for the jury stated that they were either unfamiliar with the case or that they could decide the case based upon the evidence presented at trial. Thus, we conclude that substantial evidence supports the trial court's determination that there was no evidence of actual prejudice among the members of the jury. *See State v. Lasner,* 2000–NMSC–038, ¶ 27, 129 N.M. 806, 14 P.3d 1282 (concluding that the defendant was able to question and challenge for cause potential juror members regarding pretrial publicity and holding that the trial court did not abuse its discretion by denying the defendant's change of venue motion); *State v. Hernandez,* 115 N.M. 6, 22, 846 P.2d 312, 328 (1993) ("Defendant was able to question these [prospective] jurors [who had read or heard about the case] and was able to challenge those who indicated partiality."). The trial court did not abuse its discretion by denying Defendant's change of venue motion.

### B. Defendant's Statement

{19} Defendant contends that the trial court erred by denying his motion to suppress his confession because his waiver of his constitutional rights was not knowing, intelligent, and voluntary. Defendant further claims that, because he is a Mexican national, he was entitled to consult with the Mexican consulate prior to police questioning under the Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261. We address this latter argument first.

### 1. Consular Notification

■ {20} Defendant raised the issue of consular notification for the first time in his docketing statement and thus did not properly preserve this argument. "It is well-settled that objections must be raised below to preserve an issue for appellate review." *State v. Lucero,* 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986). "A trial is first and foremost to *resolve* a complaint in controversy, and the rule [of preservation] recognizes that a trial court can be expected to decide only the case presented under issues fairly invoked." *State v. Gomez,* 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1; *accord* Rule 12–216(A) NMRA 2001 (establishing that in order for an appealing party to preserve a question for review "it must appear that a ruling or decision by the district court was fairly invoked"). Thus, we do not address the consular notification issue because Defendant failed to fairly invoke a ruling in the trial court and raises it for the first time on appeal. In his reply brief, Defendant asserts, without support, that de novo review allows the Court to review the issue as a matter of law regardless of proper preservation. We reject his claim. The standard of review on appeal is an issue that is separate and distinct from the requirement of preservation.

■ {21} Defendant correctly notes that the issue may be considered under the doctrine of fundamental error. *See* Rule 12–216(B). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco,* 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). The State presented overwhelming evidence of Defendant's guilt in this case. Because Defendant's conviction does not shock the conscience, we reject his argument regarding fundamental error.

### 2. Waiver of Rights

■ {22} Under *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d

234

694 (1966), the police must warn a suspect, prior to any questioning, that the suspect has the right to remain silent, that anything the suspect says can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney and that one will be appointed if he or she cannot afford one. In response to a defendant's motion to suppress a statement made to police during a custodial interrogation, the State must demonstrate by a preponderance of evidence that a defendant knowingly, intelligently, and voluntarily waived his or her constitutional rights under *Miranda*. *State v. Martinez*, 1999–NMSC–018, ¶ 14, 127 N.M. 207, 979 P.2d 718. Defendant claims that the State failed to make this showing and that the trial court therefore erred in denying his motion to suppress his statement. Defendant notes that this argument was properly preserved by his motion to suppress.

{23} On appeal, we review the trial court's findings of fact for substantial evidence and review de novo the ultimate determination of whether a defendant validly waived his or her *Miranda* rights prior to police questioning. *Id.* ¶ 15. In determining whether a waiver of rights is knowing, intelligent, and voluntary, we assess the totality of circumstances. *Id.* ¶ 14; *accord State v. Boeglin*, 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983).

{24} As an initial matter, Defendant claims that a different standard should apply in this case. Defendant contends that this Court should analogize the protections of the Children's Code for an alien, "with a modified substitution of the alien's government for the child's parents and the application of a standard similar to that applied to a child of 13 or 14." Defendant thus argues that, like a statement by a thirteen- or fourteen-year-old child, *see* NMSA 1978, § 32A–2–14(F) (1993), Defendant's statement should be accompanied by a rebuttable presumption of inadmissibility. Defendant's argument is unsupported; it is also without merit. *See State v. Favela*, 91 N.M. 476, 477, 576 P.2d 282, 283 (1978) ("The Legislature of New Mexico made it abundantly clear that the Children's Code applied to juveniles and not to adults."),

*overruled on other grounds by State v. Pitts*, 103 N.M. 778, 780, 714 P.2d 582, 584 (1986); *cf. State v. Setser*, 1997–NMSC–004, ¶¶ 11–15, 122 N.M. 794, 932 P.2d 484 (rejecting a claim by a sixteen-year-old child that her mental age, rather than her physical age, should be the proper measure for applying the standards in section 32A–2–14). We apply the same standard in assessing Defendant's waiver of rights as we would to all adult defendants.

{25} Defendant was arrested and transported to a detention facility in Colorado. During booking, Defendant asked Agent Hoener, "Do I need an attorney?" Agent Hoener told Defendant that he would answer his questions after booking was completed. Officers took Defendant to a ten by ten foot room, with Agent Hoener and Officer Lopez, a fluent Spanish-speaker. Defendant said he wanted to commit suicide, and Officer Lopez told him that it was best to get whatever was bothering him off his chest. Agent Hoener explained the charges to Defendant and gave him a copy of the arrest warrant. Defendant did not understand the carjacking charge, and Officer Lopez explained it to him. Defendant was read his *Miranda* rights in both English and Spanish, and he agreed to sign a waiver of rights form which was also presented to him in both English and Spanish.

{26} The Agent interviewed Defendant for approximately one and a half hours; Defendant recognizes that he "was treated cordially by the agents." Although Defendant contends that his earlier question about whether he needed an attorney was ignored, he did not indicate that he wished to stop talking or that he wanted an attorney during the interview, even after he received his *Miranda* warnings. Agent Hoener described Defendant's behavior as relaxed and cooperative. Agent Hoener and Officer Lopez testified that they did not threaten Defendant or use force or make any promises to extract a confession from Defendant.

{27} Defendant claims that the State did not demonstrate that his waiver of rights was voluntary. In order to be voluntary, Defendant's statement must have been "the product of a free and deliberate choice

rather than intimidation, coercion, or deception." *State v. Fekete*, 120 N.M. 290, 301, 901 P.2d 708, 719 (1995) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Defendant claims that he was stripped and dressed as a prisoner, questioned by two police officers in a room that was only large enough for three people, and questioned late at night. However, Defendant does not contend that the police coerced or intimidated him into waiving his *Miranda* rights. Defendant does not contest the officers' testimony that no threats, promises, or physical force was used to obtain a waiver of rights. Absent governmental overreaching or police coercion, a waiver of *Miranda* rights is voluntary for purposes of a Fifth Amendment inquiry. We therefore reject Defendant's claim that the State failed to establish that his waiver of rights was voluntary.[1]

{28} Defendant also claims that his waiver of rights was not knowing and intelligent. In order for a waiver to be knowing and intelligent, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Fekete*, 120 N.M. at 301, 901 P.2d at 719 (quoting *Moran*, 475 U.S. at 421, 106 S.Ct. 1135). Specifically, Defendant claims that he did not validly waive his right to counsel. "Resolution of whether a valid waiver of counsel has occurred depends upon the totality of the circumstances and the particular facts surrounding each case, including consideration of the mental and physical condition, background, experience and conduct of the accused." *Boeglin*, 100 N.M. at 132, 666 P.2d at 1279.

{29} As noted above, during booking, Defendant asked whether he needed an attorney. Following booking and prior to questioning, the officers explained the *Miranda*

rights to Defendant, including his right to counsel. After being read his *Miranda* rights, Defendant did not invoke his right to counsel and in fact signed the waiver of rights form. Defendant was at least 25 years of age at the time the crimes occurred. He completed three years of seminary training in Mexico. Defendant had one prior felony conviction for burglary in Vermont and therefore had some familiarity with the criminal justice system.

{30} In *State v. Castillo-Sanchez*, 1999-NMCA-085, ¶¶ 7, 8, 127 N.M. 540, 984 P.2d 787, *cert. denied*, 127 N.M. 390, 981 P.2d 1208 (1999), the defendant, who spoke only Spanish, was given a *Miranda* rights form written in Spanish, which was also read to him; he was asked if he understood his rights, including a right to the presence of an attorney. The Court of Appeals concluded "that there was sufficient evidence to support the district court's ruling that Defendant's statement was freely and voluntarily made." *Id.* ¶ 14. The Court of Appeals also rejected the defendant's assertion that he invoked his right to counsel when he asked, "Who can help me?" prior to his interrogation, concluding that the question was ambiguous at best and could have had several meanings. *Id.* ¶¶ 15–17; *see, e.g., Davis v. United States*, 512 U.S. 452, 455, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (concluding that the statement, "Maybe I should talk to a lawyer," was not a clear unequivocal request for an attorney and that the officers had no obligation to stop questioning the defendant); *Taylor v. State*, 689 N.E.2d 699, 703 (Ind.1997) (concluding that the defendant's "statement of 'I guess I really want a lawyer, but, I mean, I've never done this before so I don't know' is an expression of doubt, not a request. A reasonable police officer in the circumstances would not understand that [the defendant] was unambiguously asserting his right to have counsel present."). The Court of Appeals dis-

---

1. We do not read Defendant's brief as raising the separate argument that his confession is involuntary under the Due Process Clause of the Fourteenth Amendment. *See Fekete*, 120 N.M. at 298, 901 P.2d at 716 ("A claim that the police coerced a statement requires a different analysis than a claim that an accused voluntarily waived his or her Fifth Amendment protections under [*Miranda* ]."). To the extent that Defendant may

have attempted to make this argument, however, it fails for the same reason as his claim that his waiver of rights was involuntary. "Whether 'voluntary' is examined in the context of the Fifth Amendment (waiver) or the Fourteenth Amendment (due process), the benchmark is the absence of governmental coercion or police overreaching." *Id.* at 301, 901 P.2d at 719 (quotation marks and quoted authority omitted).

cussed the fact that the defendant spoke only Spanish but concluded that, although language barriers may increase the potential for ambiguity, "the primary protection is the *Miranda* warnings themselves." *Id.* ¶ 18; *Davis*, 512 U.S. at 460, 114 S.Ct. 2350. We agree. Defendant's ambiguous question was not a clear unequivocal request for an attorney. *See State v. Ninci*, 262 Kan. 21, 936 P.2d 1364, 1381 (1997) (concluding that, when defendant said, "Do I need to have a lawyer right now?", defendant "did not directly ask for an attorney or indicate in any way that he specifically desired an attorney").

{31} Defendant speaks both English and Spanish, and he received *Miranda* rights orally and in writing in both languages as well. We conclude that Defendant's question during booking, "Do I need an attorney?" is ambiguous. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. Defendant did not sufficiently invoke his right to counsel during booking when he asked whether he needed an attorney, and under the totality of the circumstances of his case, we conclude that the State met its burden of demonstrating that Defendant's waiver of rights was knowing and intelligent. The trial court did not err by denying Defendant's motion to suppress his confession.

## C. Admission of Evidence

{32} Defendant argues that the trial court erred by *admitting a pair of shoes* which the State did not produce until trial had commenced.

> When evidence is disclosed for the first time during trial, this Court must consider the following factors to determine whether the error is reversible: (1) whether the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court

cured the failure to timely disclose the evidence.

*State v. Mora*, 1997–NMSC–060, ¶ 43, 124 N.M. 346, 950 P.2d 789.

{33} Defendant argues that the State was required to disclose the shoes under Rule 5–501(A)(3) NMRA 2001, which requires the State to disclose "any books, papers, documents, photographs, tangible objects, buildings or places or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defense or are intended for use by the state as evidence at trial." Although the trial court allowed him to examine them during a recess, Defendant claims that the trial court failed to cure the State's error. Defendant argues that the State used the shoes to connect his footprint to the scene of the murder, without citation to the record. The State responded in its answer brief that it was unable to locate support for this allegation in the record, and in his reply brief, Defendant concedes that he is unable to support his allegation that the shoes connected him to the scene, complaining of a shortage of time. However, Defendant first made this unsupported allegation in his brief in chief. This is inadequate argument.

> We remind counsel that we are not required to do their research, and that this Court will not review issues raised in appellate briefs that are unsupported by cited authority. When a criminal conviction is being challenged, counsel should properly present this [C]ourt with the issues, arguments, and proper authority. Mere reference in a conclusory statement will not suffice and is in violation of our rules of appellate procedure.

*State v. Clifford*, 117 N.M. 508, 513, 873 P.2d 254, 259 (1994) (citations omitted). Defendant failed to show that the late admission of the shoes prejudiced him or that the trial court's actions were an inadequate cure. Thus, we conclude that this argument is without merit.

## D. Double Jeopardy

{34} Finally, Defendant asserts that the trial court erred by sentencing him for both

first degree murder and armed robbery, in violation of double jeopardy. Defendant asks this Court to reverse his conviction and sentence for armed robbery.

{35} The double jeopardy clause protects, in part, against multiple punishments for the same offense. *Swafford v. State,* 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991). Under *Swafford,* this Court applies a two-part inquiry to a case such as this involving a claim of multiple punishment. The first question is whether the conduct underlying the offenses is unitary. If the conduct is unitary, the second question is whether the Legislature intended multiple punishments for unitary conduct. *Id.* at 13–14, 810 P.2d at 1233–34. "[I]f the conduct is separate and distinct, inquiry is at an end." *Id.* at 14, 810 P.2d at 1234.

{36} Defendant contends that his conviction for armed robbery and his conviction for first degree felony murder involved unitary conduct because the force he used to rob the victim merged with the force used to kill her. The State responds that Defendant's confession supports the notion that his acts and objectives of his conduct were not unitary but were instead distinct.

> The "indicia of distinctness" include the separation between the illegal acts by either time or physical distance, "the quality and nature" of the individual acts, and the objectives and results of each act. Distinctness may also be established by the existence of an intervening event, the defendant's intent as evinced by his or her conduct and utterances, the number of victims, and the behavior of the defendant between acts.

*Cooper,* 1997–NMSC–058, ¶ 59, 124 N.M. 277, 949 P.2d 660 (citation omitted). The State argues that Defendant stated that he killed the victim because she would not stop screaming after he fired the initial shots, not primarily to steal the truck. We agree that the record supports the theory that Defendant killed the victim to silence her, not merely to steal the truck; Defendant said that the victim screamed and he shot her a second time, and that she kept screaming, so he shot her a third time, in the head. Defendant said that he watched the victim exit her vehicle and thought that he could reach the

truck before the victim could return to it. Defendant's own remarks indicate that he approached the victim with the intent to steal the truck, but that he shot the victim to silence her because she would not stop screaming. Defendant's differing intentions and objectives provide adequate indicia of distinctness. *See id.* Because we have determined that there was no unitary conduct, we do not address the second part of the *Swafford* test. *See Swafford,* 112 N.M. at 14, 810 P.2d at 1234. Thus, we affirm Defendant's armed robbery conviction and sentence.

### III. Conclusions

{37} The trial court did not abuse its discretion by denying Defendant's change of venue motion; substantial evidence supports the trial court's determination that there was no evidence of actual prejudice among the members of the jury. Under New Mexico case law and that of the United States Supreme Court, Defendant did not sufficiently invoke his right to counsel when he ambiguously asked whether he needed an attorney during booking. Under the circumstances of this case, Defendant's waiver of rights was knowing, intelligent, and voluntary, and the police complied fully with the requirements of *Miranda.* Defendant failed to fairly invoke the issue of consular notification in the trial court and raises it for the first time on appeal; it is thus unpreserved. We find no fundamental error. We conclude that the trial court did not err by admitting Defendant's shoes. Defendant failed to show that the late admission of the shoes prejudiced him or that the trial court's actions were an inadequate cure; thus, his argument is without merit. Finally, we reject Defendant's double jeopardy argument because his conduct was not unitary. We affirm Defendant's convictions.

{38} **IT IS SO ORDERED.**

WE CONCUR: JOSEPH F. BACA, Justice, GENE E. FRANCHINI, Justice, PAMELA B. MINZNER, Justice, and PETRA JIMENEZ MAES, Justice.