This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.

**NO. A-1-CA-34992**

**ARMANDO MARTINEZ,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary L. Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
David Henderson, Appellate Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VANZI, Chief Judge.**

{1}     Defendant Armando Martinez appeals his convictions for criminal sexual penetration in the second degree (CSP II), pursuant to NMSA 1978, Section 30-9-11(E)(3) (2009); false imprisonment, pursuant to NMSA 1978, Section 30-4-3 (1963); and aggravated battery, pursuant to NMSA 1978, Section 30-3-5(B) (1969). Defendant argues that (1) the district court erred in finding him competent to stand trial; (2) he did not provide a voluntary, knowing, and intelligent waiver of his *Miranda* rights; (3) his false imprisonment conviction should be vacated because it was based on incidental conduct, or alternatively, that his false imprisonment and CSP II convictions violate double jeopardy; and (4) his trial counsel was ineffective. We affirm.

**BACKGROUND**

**Factual Background**

{2}     The testimony at trial was as follows. Victim was Defendant's elementary school teacher approximately twenty-five years ago. Victim and Defendant reconnected in 2013 on Memorial Day, at which time Defendant informed Victim that he was down on his luck. Victim agreed to help Defendant get a job and let him move into her house in Santa Fe. At that time, Defendant was forty-one and Victim was fifty-eight. Victim denied that they shared a sexual relationship and testified at trial that they had separate bedrooms.

**{3}** On or about the evening of August 14, 2013, Defendant had consumed a glass of wine and some beer. He seemed on edge and became upset when he learned that Victim had made plans that did not include him. Victim retired to her separate bedroom, but Defendant repeatedly knocked on her door. She refused to open the door and told Defendant that her bedroom was her "private space." After approximately two minutes, Defendant pushed the door in while Victim was in the bathroom adjacent to her bedroom. Defendant grabbed Victim and threw her on the bathroom floor. He then got on top of her, tore her pajamas off, held her down, and had forcible nonconsensual sex with her. Victim tried to resist but Defendant was stronger than she was. After the encounter, Defendant proceeded to leave the room but then turned around and forced Victim to have nonconsensual sex a second time.

**{4}** After the second attack, Defendant left the bedroom, and Victim called 911. Defendant took the phone and threw it against the wall. He then physically attacked Victim by throwing her on the bed, punching her several times in the face, and choking her. The assault ended when sheriff's deputies arrived.

**{5}** Defendant let the deputies in the residence. Although the deputies talked with Defendant inside the home, Defendant was not advised of his rights until later when one of the responding deputies secured Defendant in her patrol car and read him the *Miranda* warnings. According to the deputy, Defendant said "yes" when she asked him if he understood his rights. Detectives arrived to process the scene and Defendant

3

was transported to the sheriff's station. Detective Joshua David interviewed Defendant at the station shortly after 3:45 a.m. Defendant was read his *Miranda* rights before the interview and asked if he understood them. He said that he did understand his rights by saying "yes" and signed the waiver of rights form. Detective David testified that "it was apparent that [Defendant] had been consuming alcoholic beverages, [and Detective David] could smell an odor of an alcoholic beverage on him," but that Defendant was "coherent" and "seemed to understand what was going on." Detective David also noted that they "were both a little bit tired." During the interview, Defendant initially denied that he attacked Victim, stated that he and Victim were boyfriend and girlfriend, and that they had engaged in consensual sex the night of the incident. At the end of the interview, however, Defendant admitted that "she told me not right now" and that he did not think Victim wanted to have sex.

{6}     Defendant was charged with two counts of CSP II, contrary to Section 30-9-11(E)(3); one count of false imprisonment, contrary to Section 30-4-3; and one count of aggravated battery, contrary to Section 30-3-5(B).

**The Competency Evaluation and Hearing**

{7}     Defendant's trial attorney requested a forensic evaluation pursuant to NMSA 1978, Section 43-1-1 (1999), which deals with determinations of mental retardation, and NMSA 1978, Section 31-9-1.1 (1993), which pertains to the process for obtaining a competency evaluation. The district court entered an order staying proceedings to

allow for a competency determination for purposes of determining whether Defendant was competent to stand trial. *See State v. Rotherham*, 1996-NMSC-048, ¶ 13, 122 N.M. 246, 923 P.2d 1131 (holding that a defendant is competent to stand trial when he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding[,] . . . has a rational as well as factual understanding of the proceedings against him[, and has] . . . the capacity to assist in his own defense and to comprehend the reasons for punishment" (omission, internal quotation marks, and citations omitted)).

{8}     Defendant was evaluated by Dr. Susan Cave, a clinical and forensic psychologist. Dr. Cave met with Defendant on three separate occasions to conduct the competency evaluation. On February 6, 2015, the district court held a competency hearing at which Dr. Cave was the only witness. The following undisputed facts derive from her testimony.

{9}     Defendant was a special education student and a "slow learner" in school. He dropped out of high school and, despite his effort, was unable to obtain a high school graduation equivalency diploma. Defendant had various jobs after that, including some landscaping work, and eventually landed a steady job at Big-O Tires operating the car lift. He held that job for ten years and, according to Dr. Cave, he essentially just pushed a button that made the lift go up and down, and it was the type of work

someone with mental retardation would be able to handle because "it's simple, it's repetitive, it's routine."

{10} Dr. Cave evaluated Defendant's intelligence and competence by performing several tests. On one such test Defendant could not do simple math subtraction. Dr. Cave emphasized that Defendant displayed very "concrete" and "literal" thinking, which "is characteristic of persons with a low level of intellectual functioning." For instance, when asked to interpret the abstract concept "you can lead a horse to water but can't make him drink," he said, "you can't make the horse drink." However, she acknowledged that "he did get the concept of trust" and told her that a promise should be kept because "it's important you trust somebody."

{11} Based on a test that evaluates intellectual functioning, Dr. Cave concluded that Defendant had a full-scale intelligence quotient (I.Q.) of sixty-five. An average person's I.Q. is one hundred, and the legal definition of mental retardation in New Mexico is an I.Q. of seventy or below. *See* NMSA 1978, § 31-9-1.6(E) (1999). In addition, Dr. Cave determined that Defendant's mental age equivalence in certain areas that indicate a person's real-world functioning ranged from three years old to above sixteen years old.

{12} Dr. Cave also performed a competency assessment that specifically looks at a person's ability to be competent to stand trial. According to Dr. Cave, Defendant knew he was charged with CSP and for "hitting" Victim, although he "had no idea"

6

what the consequences of conviction were. He was, however, able to say that the charges were felonies, felonies are more serious than misdemeanors, and that he could go to prison if found guilty. He knew what pleas a defendant could enter into court and "could define not guilty and guilty." He appropriately categorized the roles of the public defender, judge, and jury, but had trouble defining the role of the district attorney. Defendant was also able to tell Dr. Cave what some of the specific conditions of probation might be, such as no weapons, alcohol, or contact with Victim. And he understood that there would be no probation if he was found not guilty. Moreover, he understood that he was not compelled to testify and defined "evidence" as "proof." Defendant also knew that he would be giving up his rights if he accepted a plea bargain. He knew who his attorney was and said that he could help his lawyer by telling his version of events. He also understood what confidentiality was.

{13} Dr. Cave concluded that Defendant was "not competent to stand trial . . . because of the developmental disability" and opined that the disability "significantly impedes his ability to work with his attorney in his own defense in a rational and factual manner." She also opined that Defendant is not treatable to competency as there is no ability to improve mental retardation because it is "chronic and lifelong."

{14} Although Dr. Cave opined that Defendant was incompetent to stand trial, the district court found that her testimony revealed several bases on which to find Defendant competent. The court expressly considered the competency factors outlined

7

by our Supreme Court in *Rotherham*, together with this Court's holding in *State v. Rael*, 2008-NMCA-067, 144 N.M. 170, 184 P.3d 1064, where we held that a finding of mental retardation is not dispositive of the competency question. *Rael*, 2008-NMCA-067, ¶ 16. Specifically, the district court found as follows:

> When I look at the *Rael* case and I look at how the *Rael* case determined competency [under] the factors that were enumerated there that are consistent with Dr. Cave's citation to *Rotherham*, I don't find that . . . Defendant is, by a preponderance of the evidence, incompetent to stand trial. With respect to the mental retardation aspect, yes there is a presumption that requires the State to overcome that burden. . . . I find that there was a presumption of mental retardation but I think that overall the evidence that I have read and heard today overcomes that [presumption].

{15}   Prior to trial, Defendant filed a motion to suppress statements he made to law enforcement under the Fifth and Sixth Amendments of the United States Constitution. Defendant argued that any on-scene questioning amounted to a "custodial interrogation" and that Defendant should have been read his *Miranda* rights prior to the questioning. The State conceded that any pre-*Miranda* statements made at Victim's house should be suppressed. Defendant also argued that all post-*Miranda* statements should be suppressed as fruits of the poisonous tree, his waiver of *Miranda* rights was not voluntary, and his statements were made involuntarily. The district court entered an order granting Defendant's motion to suppress statements he made to police prior to being advised of his *Miranda* rights, but denied Defendant's motion to suppress post-*Miranda* statements made during Detective David's custodial

8

interrogation, finding that Defendant "voluntarily, knowingly, and intelligently waived his *Miranda* rights[.]"

{16} A jury convicted Defendant on all counts. On appeal, Defendant argues that the district court erred in finding him competent to stand trial. Defendant maintains that he was mentally retarded and that "his disability rendered him incompetent." Defendant also argues that he did not voluntarily waive his *Miranda* rights; his false imprisonment conviction should be vacated because it was based on incidental conduct, or alternatively, because it violates the prohibition against double jeopardy; and that his trial counsel was ineffective. We review Defendant's arguments in turn.

**DISCUSSION**

**Competency**

{17} "[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *State v. Flores*, 2005-NMCA-135, ¶ 15, 138 N.M. 636, 124 P.3d 1175 (internal quotation marks and citation omitted). "It is a violation of due process to prosecute a defendant who is incompetent to stand trial." *Id.* ¶ 16 (alteration, internal quotation marks, and citation omitted). "A defendant is presumed competent to stand trial[.]" *Rael*, 2008-NMCA-067, ¶ 6. To overcome this presumption, a defendant "bears the burden of

9

proving by a preponderance of the evidence that he or she is incompetent to stand trial[.]" *State v. Chavez*, 2008-NMSC-001, ¶ 23, 143 N.M. 205, 174 P.3d 988.

**{18}** The district court's competency determination is reviewed for an abuse of discretion. *See State v. Linares*, 2017-NMSC-014, ¶ 39, 393 P.3d 691 (noting that the district court did not abuse its discretion in finding a defendant incompetent); *see also Rael*, 2008-NMCA-067, ¶ 6 ("[W]e review the district court's determination only for an abuse of discretion, viewing the evidence in the light most favorable to the [district court's] decision." (internal quotation marks and citation omitted)). "An abuse of discretion occurs when a ruling is against logic and is clearly untenable or not justified by reason." *Linares*, 2017-NMSC-014, ¶ 24 (internal quotation marks and citation omitted). On appeal, the evidence is viewed "in the light most favorable to the district court's decision, [and the appellate courts] resolve all conflicts and indulge all permissible inferences to uphold that decision, and disregard all evidence and inferences to the contrary." *Id.*

**{19}** "Section 31-9-1.6 articulates the procedure for determining whether a defendant is incompetent to stand trial as a result of mental retardation[.]" *Linares*, 2017-NMSC-014, ¶ 25 (internal quotation marks and citation omitted). " '[M]ental retardation' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior." Section 31-9-1.6(E). There is a presumption of

mental retardation when a defendant has an I.Q. "of seventy or below on a reliably administered intelligence quotient test." *Id.*

{20} Our Supreme Court has held that, although a defendant may be incompetent to stand trial because of mental retardation, "mental retardation, in and of itself, is not conclusive evidence that a defendant is incompetent." *Linares*, 2017-NMSC-014, ¶ 33; *Rael*, 2008-NMCA-067, ¶ 16 ("[A] finding of mental retardation does not necessarily require that a person also be found incompetent to stand trial[.]"). In order to be found incompetent to stand trial as a result of mental retardation, the developmental disability must hinder the defendant's capacity to understand the proceedings against him and assist in his defense. *See Linares*, 2017-NMSC-014, ¶ 34 (proceeding to consider a defendant's competence under the *Rotherham* factors and noting that "mental retardation may factor into this analysis—and may factor heavily—but the mere fact that [a defendant] is mentally retarded does not, in and of itself, resolve the question of . . . competency").

{21} Under *Rotherham*, a defendant is competent to stand trial when he has (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding[,]" (2) "a rational as well as factual understanding of the proceedings against him[,]" and (3) "the capacity to assist in his own defense and to comprehend the reasons for punishment." 1996-NMSC-048, ¶ 13 (internal quotation marks and citation omitted).

11

{22} Defendant contends that the district court erred in finding him competent to stand trial, arguing that "[t]here is no record of any valid reason for rejecting Dr. Cave's opinion[,]" and without citation to supporting legal authority, Defendant argues that "[w]hen expert opinion on . . . mental retardation . . . is uncontroverted, the [district] court must accept the expert's testimony as true." Defendant also maintains that the court erred in finding that he was not mentally retarded, even though the court noted that there was a presumption of mental retardation. For the reasons that follow, we are not persuaded.

{23} At the outset, we dispense with the notion that the district court was required to accept Dr. Cave's expert testimony that Defendant was incompetent to stand trial. *See, e.g.*, *State v. Jason F.*, 1998-NMSC-010, ¶ 29, 125 N.M. 111, 957 P.2d 1145 (explaining that the fact-finder is not bound to accept an expert's opinion as to a defendant's competency, even when that opinion is compelling); *State v. Gonzales*, 1997-NMSC-050, ¶ 18, 124 N.M. 171, 947 P.2d 128 ("Determining credibility and weighing evidence are tasks entrusted to the [district] court sitting as fact-finder.").

{24} As we explain below, we next conclude that Dr. Cave's testimony provided substantial evidence to support the district court's determination that Defendant was competent to stand trial. *See Linares*, 2017-NMSC-014, ¶ 39 ("Our inquiry is limited only to whether substantial evidence supports the [competency] conclusion the court reached."); *see also In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915

P.2d 318 (explaining that the question for us on appeal is whether the district court's "decision is supported by substantial evidence, not whether the court could have reached a different conclusion").

{25} Dr. Cave testified as to Defendant's ability to consult with his attorney and assist in his defense. According to Dr. Cave, Defendant was able to identify and name his attorney. Defendant also understood he could help his defense by telling his lawyer his version of events, and importantly, knew what confidentiality was "in his . . . concrete way of expressing himself." *Cf. Rael*, 2008-NMCA-067, ¶ 11 (concluding that the district court did not abuse its discretion in finding the defendant competent to stand trial and observing that the defendant did not know what confidentiality was even after it was explained to him, but did understand he should tell his attorney everything he knew even though he did not know the name of his attorney).

{26} Dr. Cave also testified as to Defendant's understanding of the nature of the proceedings against him and acknowledged that Defendant expressed an understanding of the pleas he could enter in court and knew the definitions of "guilty" and "not guilty." Although he had some difficulty understanding the district attorney's role, he accurately categorized the roles of other courtroom players, such as the public defender, judge, and jury. Of note, when asked to define the public defender's role, Defendant said, "[He] is there to defend me." Defendant also demonstrated an understanding of probation and was also able to tell Dr. Cave what some of the

13

specific conditions of probation might be, such as, no weapons, alcohol, or contact with Victim. He further understood that there would be no probation if he was found not guilty. Defendant also knew that if he accepted a plea bargain he would be giving up his rights. *Cf. id.* ¶¶ 9-10 (noting that the defendant did not understand the district attorney's role, yet understood that his attorney's job was to work for him, what pleas he could enter in court, and that a condition of probation was not getting in trouble).

**{27}** Dr. Cave's testimony additionally indicates that Defendant comprehended the nature of the charges against him and the reasons for punishment. Defendant knew he was charged with CSP and for "hitting" Victim. He appreciated the difference between misdemeanors and felonies and that felonies were more serious offenses. Defendant was aware that he could go to prison if he was found guilty. Moreover, Defendant knew that he did not have to testify and defined evidence as "proof." *Cf. id.* ¶ 9 (noting that the defendant was "able to state the charge against him[,]" understood that he was charged with a felony, that a felony is more serious than a misdemeanor, and that he could go to prison if found guilty).

**{28}** Based on Dr. Cave's testimony, we hold that the district court did not abuse its discretion when it rejected Dr. Cave's opinion that Defendant was competent to stand trial because substantial evidence supports the court's conclusion, and evidence of mental retardation is not conclusive of the competency question. *See Linares*, 2017-NMSC-014, ¶ 33 ("[M]ental retardation, in and of itself, is not conclusive

14

evidence that a defendant is incompetent."); *Rael*, 2008-NMCA-067, ¶¶ 2, 15 (concluding that there was sufficient evidence supporting the district court's finding of competency even where the evaluating psychologist recommended that the defendant, who had a full-scale I.Q. score of sixty-eight, be found incompetent).

**Motion to Suppress**

{29} The next issue on appeal is whether the district court erred in denying Defendant's motion to suppress statements made to Detective David. In reviewing the district court's denial of a motion to suppress, "[w]e consider the facts in the light most favorable to the prevailing party and defer to the district court's findings of fact if those findings are supported by substantial evidence." *State v. Anaya*, 2008-NMCA-020, ¶ 5, 143 N.M. 431, 176 P.3d 1163, *abrogated on other grounds as recognized by State v. Dopslaf*, 2015-NMCA-098, ¶ 11, 356 P.3d 559. Our review is de novo to the extent that we must consider the district court's application of the law to the facts. *See State v. Hubble*, 2009-NMSC-014, ¶ 5, 146 N.M. 70, 206 P.3d 579.

{30} Law enforcement must give a suspect the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), when the suspect is subjected to a "custodial interrogation." *State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442 (internal quotation marks and citation omitted). It is not disputed that Detective David subjected Defendant to a custodial interrogation. When a defendant moves "to suppress a statement made to police during a custodial interrogation, the [s]tate must

demonstrate by a preponderance of evidence that a defendant knowingly, intelligently, and voluntarily waived his or her constitutional rights under *Miranda*." *State v. Barrera*, 2001-NMSC-014, ¶ 22, 130 N.M. 227, 22 P.3d 1177. Defendant argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. He specifically contends that Detective David's interrogation "overbore his will." We disagree.

{31} First, as to Defendant's argument that his *Miranda* waiver was not voluntary, we note that Defendant does not argue that he was subjected to any official intimidation, coercion, or deception during Detective David's interrogation and the record does not reveal any. *See Barrera*, 2001-NMSC-014, ¶ 27 ("In order to be voluntary, [a d]efendant's statement must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception." (internal quotation marks and citation omitted)). We also note that Defendant acknowledges that the detective was not informed about Defendant's developmental disability and did not notice anything concerning about Defendant's mental capacity. Furthermore, Detective David testified that, although Defendant had been drinking, Defendant appeared "coherent." Absent any evidence that there was official coercion or that Detective David knew about and intentionally exploited Defendant's developmental disability, we cannot say that Detective David's interrogation overbore Defendant's will. *See State v. Evans*, 2009-NMSC-027, ¶ 38, 146 N.M. 319, 210 P.3d 216

16

(whether a confession is voluntary depends on whether there has been official coercion, and "when interrogators are unaware of, and therefore cannot exploit, the mental or emotional vulnerabilities of a suspect, the crucial link between the confession and official action is missing"); *see also State v. Fekete*, 1995-NMSC-049, ¶ 35, 120 N.M. 290, 901 P.2d 708 ("[A] confession is not involuntary solely because of a defendant's mental state."). *But see Aguilar v. State*, 1988-NMSC-004, ¶¶ 12-13, 106 N.M. 798, 751 P.2d 178 (noting that where police were aware of a defendant's "subnormal intelligence and mental illness," and made implied threats and promises during questioning, the state had not, under the totality of the circumstances, demonstrated a voluntary, knowing, and intelligent waiver). We therefore reject Defendant's claim that the State failed to establish that his waiver of rights was voluntary.

{**32**}     We next consider whether Defendant's waiver was knowing and intelligent. "In order for a waiver to be knowing and intelligent, it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Barrera*, 2001-NMSC-014, ¶ 28 (internal quotation marks and citation omitted). Defendant claims his waiver was not knowing and intelligent because (1) he "was not advised that he was waiving [his] rights" or that he could terminate the interview at any time, (2) he was developmentally disabled, (3) it was 4:00 a.m., and (4) he had been drinking.

17

{33} To the extent that Defendant relies on *Fekete* for the proposition that Defendant did not voluntarily waive his rights because his waiver was not knowing and intelligent, we note that our Supreme Court concluded in that case that the waiver was constitutionally proper because, although there was conflicting evidence on the defendant's ability to understand the nature and consequences of waiver, there was substantial evidence to support the district court's order denying suppression. *See* 1995-NMSC-049, ¶ 51 ("[A]lthough [the defendant] has a mental disease, there is evidence in the record to support the fact that he understood the meaning and consequences of his actions."). In this case, there is no evidence in the record that Defendant did not comprehend the nature and consequences of waiving his rights. Defendant relies on generalized arguments that adults with developmental disabilities are typically passive and agreeable and that Defendant "was the equivalent of a child under seven (or younger) in adaptive behaviors." Defendant contends that he was not capable of repeating the information contained on the waiver of rights form or explaining its meaning. But Defendant does not cite any legal authority stating that this is a prerequisite to a voluntary, knowing, and intelligent waiver, or that law enforcement is required to have suspects repeat and explain the meaning of the waiver form. Moreover and importantly, it is pure speculation that Defendant would not have been able to repeat or explain the information because Defendant points to no evidence in the record where he was asked to do so and could not.

18

{34} In addition, the record reflects that Detective David reviewed the waiver of rights form with Defendant, and Defendant said that he understood his rights and he signed the waiver form. Although Defendant argues that he was not told he was waiving his rights or could terminate the interrogation at any time, he does not cite any supporting legal authority requiring that he be so informed. While Detective David testified that Defendant had been drinking, the detective did not state that Defendant appeared intoxicated or impaired, but rather, that Defendant was "coherent." Defendant did not present any evidence that his alcohol consumption affected his ability to understand the contents and consequences of his waiver. Likewise, Defendant did not provide any evidence that the hour of the interrogation or the fact that he and Detective David were tired impacted Defendant's understanding of the rights he waived or the consequences of his actions. In light of this evidence, we perceive no error in the district court's conclusion that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, and we affirm the denial of Defendant's motion to suppress.

**The False Imprisonment Conviction**

{35} Defendant next contends that his conviction for false imprisonment should be vacated because the State failed to prove false imprisonment or, alternatively, that punishing both false imprisonment and CSP II violates the protection against double jeopardy. The State concedes that Defendant's conviction for false imprisonment

19

should be vacated. Because we are not required to accept the State's concession, we independently review the merits of Defendant's argument. *See State v. Guerra*, 2012-NMSC-027, ¶ 9, 284 P.3d 1076 (noting that the state's concession is not binding on appeal). We disagree with both Defendant and the State that the conviction should be vacated.

{36} Defendant alleges that any restraint or confinement as required for a false imprisonment conviction was incidental to the restraint or confinement inherent in the CSP II. In support of his argument, Defendant relies on *State v. Trujillo*, 2012-NMCA-112, ¶ 29, 289 P.3d 238, in which we held "the Legislature did not intend to punish as kidnapping restraint or movement that is merely incidental to another crime." However, we note that *Trujillo* is inapplicable to this case because it pertains specifically and exclusively to the offense of kidnapping. *See id.* ¶¶ 23-42 (considering the history of the kidnapping statutes and the serious nature of that offense, while also emphasizing that we were specifically considering whether the Legislature intended the defendant's conduct to constitute kidnapping under the factual circumstances of that case). We therefore proceed to consider Defendant's alternative double jeopardy argument. Double jeopardy claims are reviewed de novo on appeal. *State v. Gutierrez*, 2012-NMCA-095, ¶ 8, 286 P.3d 608.

{37} It is a violation of double jeopardy to punish a defendant multiple times for the same offense. *State v. Montoya*, 2013-NMSC-020, ¶ 23, 306 P.3d 426. When a

20

defendant is charged with violations of multiple statutes for the same conduct, we refer to the case as a "double-description" case, *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61, and apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223: (1) whether the conduct is unitary, and (2) if so, whether the Legislature intended to punish the offenses separately. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616 (internal quotation marks and citation omitted).

{38}     Where "the jury reasonably could have inferred independent factual bases for the charged offenses[,]" conduct is not unitary. *State v. Melendrez*, 2014-NMCA-062, ¶ 8, 326 P.3d 1126 (internal quotation marks and citation omitted). "In . . . consideration of whether conduct is unitary, [our Supreme Court has] looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *DeGraff*, 2006-NMSC-011, ¶ 27.

{39}     The false imprisonment and CSP II convictions were not based on unitary conduct because they were each premised on separate and distinct acts. *See id.* ("When determining whether [a d]efendant's conduct was unitary, we consider whether [the d]efendant's acts are separated by sufficient indicia of distinctness." (internal quotation marks and citation omitted)). Defendant's conduct of entering

21

Victim's bedroom, grabbing Victim, and throwing her on the bathroom floor was sufficient for the offense of false imprisonment and distinct from the act of laying on top of her, holding her down, and having forcible nonconsensual sex with her. The jury instructions for false imprisonment and CSP II, moreover, did not contain overlapping elements. To illustrate, the instructions for false imprisonment read, in relevant part:

> For you to find [D]efendant guilty of [f]alse [i]mprisonment . . . , the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [D]efendant confined [Victim] against her will;
> 2. [D]efendant knew he had no authority to confine [Victim];
> 3. This happened in New Mexico on or about the 14th day of August 2013.

Meanwhile, the jury instructions for CSP II read, in relevant part:

> For you to find [D]efendant guilty of criminal sexual penetration causing personal injury . . . , the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [D]efendant caused [Victim] to engage in sexual intercourse;
> 2. [D]efendant caused the insertion of his penis into the vagina of [Victim] through the use of physical force or physical violence;
> 3. [D]efendant's acts resulted in bruising to [Victim's] arms and legs and mental anguish to [Victim];
> 4. [D]efendant's act was unlawful;
> 5. This happened in New Mexico on or about the 14th day of August, 2013.

22

{40}     As our law permits conviction for false imprisonment based on restraint or confinement even for a brief time, *State v. Corneau*, 1989-NMCA-040, ¶ 12, 109 N.M. 81, 781 P.2d 1159, the false imprisonment charge, although based on conduct that was brief and immediately preceding the conduct giving rise to the CSP II charge, was not premised on the same conduct. *See id.* ¶ 11 (concluding that, in a case where the defendant was charged with both false imprisonment and CSP, "the facts in this case . . . support a finding of false imprisonment before or after the forcible intercourse"). Stated differently, the restraint that occurred when Defendant entered the bedroom uninvited and grabbed and threw Victim down was not the same restraint used to commit the act of CSP II. *See id.* ¶ 16 ("[O]n the facts we have before us, the restraint which preceded the act of CSP was not the same 'force or coercion' necessary to establish CSP, or the same restraint inherent in CSP."); *see also State v. Dominguez*, 2014-NMCA-064, ¶ 10, 327 P.3d 1092 ("That [the d]efendant used the same *type* of force to restrain [the v]ictim during the kidnapping and during the CSP does not create unitary conduct out of the independent and factually distinct bases for these crimes."); *State v. Fielder*, 2005-NMCA-108, ¶ 33, 138 N.M. 244, 118 P.3d 752 (discussing *Crain* and noting that the double jeopardy violation in that case was specifically based on the seriousness of kidnapping and CSP II convictions, which both entailed nine-year sentences); *State v. Crain*, 1997-NMCA-101, ¶ 17, 124 N.M. 84, 946 P.2d 1095 (concluding that double jeopardy was violated when "[a]ll of [the

23

d]efendant's convictions[, including kidnapping and CSP,] stem from the same act of sexual intercourse and involve the use of force or physical violence as a common element" and that "[b]ecause both forms of CSP II and the kidnapping charge involve the use of force during the same act of sexual intercourse, we conclude that the conduct underlying all of [the d]efendant's convictions is unitary").

{41} Alternatively, the jury could have concluded that Defendant's presence in the bedroom after he pushed the door in prevented her from leaving, particularly because Victim explicitly stated that the bedroom was her "private space" and refused to open the door. "False imprisonment does not require physical restraint of the victim; it may also arise out of words, acts, gestures, or similar means." *Corneau*, 1989-NMCA-040, ¶ 12. The jury also could have concluded that Defendant's physical attack after the sexual assault where he threw Victim on the bed, punched her, and choked her constituted the false imprisonment because Victim was confined against her will. Under any of these theories, there was sufficient evidence for the jury to find that the conduct underlying the false imprisonment was separate and distinct from that underlying the CSP II. *See State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 ("The proper analytical framework [for determining unitary conduct] is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." (internal quotation marks and citation omitted)). Because there was sufficient evidence that the conduct giving

24

rise to the false imprisonment charge was separate and distinct from the conduct giving rise to CSP II charge, the conduct was not unitary and Defendant's conviction for false imprisonment did not violate Defendant's right to be free from double jeopardy.

{42} We additionally note that, contrary to Defendant's argument, the false imprisonment statute is not a multi-purpose statute; nor is it written in the alternative. *See Gutierrez*, 2012-NMCA-095, ¶ 14 (noting that we apply the modified *Blockburger* test when the statute is written with "many alternatives"). Defendant's argument is that the false imprisonment statute is written in the alternative because it requires "restraint" or "confinement" as an element of the offense. Defendant does not cite any case distinguishing between "restraint" and "confinement" for purposes of the false imprisonment statute and a double jeopardy analysis. Accordingly, we do not consider the State's legal theory of the case pursuant to the modified *Blockburger* test. *See Swick*, 2012-NMSC-018, ¶ 12 (explaining that the modified *Blockburger* test entails "consider[ing] the [s]tate's legal theory in assessing whether each provision requires proof of a fact which the other does not").

{43} As a final matter, we note that, for the same reasons stated above, we are unpersuaded that there was insufficient evidence for the jury to find that Defendant committed any acts of confinement or restraint as required for false imprisonment.

**Ineffective Assistance of Counsel**

25

{44} Defendant also claims on appeal that his trial counsel was ineffective. Defendant argues, in particular, that counsel was ineffective in not raising Defendant's diagnosis of mental retardation in relation to whether he voluntarily waived his *Miranda* rights and as a defense at trial. Defendant has not demonstrated how counsel's "deficient performance prejudiced [the] defense" and how, but for counsel's performance, the result of the proceeding would have been different. *State v. Dylan J.*, 2009-NMCA-027, ¶¶ 36, 38, 145 N.M. 719, 204 P.3d 44. In this circumstance, we note that our Supreme Court has expressed a preference for habeas corpus proceedings to address ineffective assistance of counsel claims, *State v. Grogan*, 2007-NMSC-039, ¶ 9, 142 N.M. 107, 163 P.3d 494, and therefore instruct Defendant to initiate habeas corpus proceedings if he is so inclined.

{45}    **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Chief Judge**

**WE CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

_____
**JULIE J. VARGAS, Judge**