This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: October 19, 2020**

**No. S-1-SC-37364**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**AMEER MUHAMMAD,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Jacqueline Flores, District Judge**

Bennett J. Baur, Chief Public Defender
Steven James Forsberg, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**{1}** Defendant Ameer Muhammad was convicted of first-degree felony murder for stabbing and killing Victim Aaron Sieben during an armed robbery. Defendant appeals his conviction on two grounds. First, he argues that statements he made to police should have been suppressed because he did not knowingly and intelligently waive his rights before speaking with police. He specifically argues that his mental illness and schizophrenic delusions prevented him from understanding his rights and the

consequences of abandoning those rights. Second, he argues that the jury should have received a self-defense instruction.

**{2}** We reject both of Defendant's arguments and affirm his conviction. First, the record demonstrates that Defendant's waiver was made knowingly and intelligently despite his apparent mental illness. Second, the district court was correct to deny Defendant his requested self-defense instruction because the evidence at most supported that Defendant was subject to a simple battery from Victim. Because these issues are sufficiently addressed by New Mexico precedent, we exercise our discretion to resolve this case by way of a non-precedential decision under Rule 12-405(B)(1) NMRA.

## I.    TRIAL TESTIMONY

**{3}** At trial, several eyewitnesses testified to the following sequence of events leading to Victim's death.

**{4}** As George and Lindsy Brigham pulled into a convenience store parking lot, Lindsy saw Defendant standing by the driver's side window of a parked truck. Defendant then took off running. Victim got out of the truck, shouted "Somebody get that motherfucker," and started running after Defendant. George testified that he lost sight of the two men, but when he saw them again they were in the middle of the street. Defendant was coming at Victim with a knife and Victim was backing away with his hands up as if to defend himself. Defendant stabbed Victim twice in the torso, rifled through Victim's pockets, took Victim's wallet, and fled. George and Lindsy tried to save Victim by stopping the bleeding until first responders arrived.

**{5}** The eyewitnesses presented slightly differing testimony concerning whether there was a fight between Victim and Defendant before Defendant stabbed Victim. Two other eyewitnesses testified that they saw two men fighting, one of the men fall, and the other man run away. Lindsy Brigham also testified that she saw the two men fighting. She thought that one of the men was throwing punches at the other, but later realized that she was seeing Defendant stabbing Victim. George Brigham never saw Victim strike Defendant. Victim's autopsy indicated that he had defensive wounds on his hands and forearms and that his cause of death was a stab wound to the chest.

**{6}** One of the eyewitnesses, Gary Farmer, followed Defendant when he ran away. As Farmer followed Defendant, Defendant showed Farmer a large cut on his left arm and told Farmer that he had just tried to kill himself. Farmer eventually spoke to police officers, who found and arrested Defendant in a nearby parking lot. Officer Adam Theroux of the Albuquerque Police Department recalled that Defendant had a large cut on his left forearm that was bleeding heavily.

**{7}** Officer Theroux searched Defendant and found a large kitchen knife covered in blood in Defendant's waistband. Law enforcement also collected Defendant's clothing, including a blood stained t-shirt. Victim's wallet was found near the scene of the

stabbing with blood on it. Victim's DNA was found on the knife and Defendant's t-shirt. Both Victim's and Defendant's DNA were found on the wallet.

**{8}** In addition to the eyewitness testimony and physical evidence, the State introduced several audio recordings of Defendant's statements, accompanied by the testimony of Detective Marie Anastasia Sullivan of the Albuquerque Police Department. The recordings were from an interview with police officers which occurred after Defendant began speaking to the officers during the execution of a search warrant for buccal swabs, major case prints, and photographs. As the crime scene specialist was executing the warrant, Defendant spontaneously said, "What's the point if you guys already know I did it? . . . Y'all saw me. I had a bloody knife on me. . . . [Y]ou saw me at the scene of the crime." Detective Sullivan testified that she did not ask any follow up questions until after Defendant had been informed of his rights and decided to speak to the officers.

**{9}** During the interview, Defendant explained that his plan on the day he killed Victim was to buy meth, get high, and kill himself. Defendant did not have enough money to buy meth and told a dealer that he would have to rob someone. After seeing that Victim had $100 in his wallet, Defendant went up to Victim's truck, put a knife to Victim's chest, and demanded all of the money in Victim's wallet. Victim rolled up his window and Defendant walked away. Victim got out of his truck and came over to Defendant, who stabbed Victim twice. Defendant then took Victim's wallet and ran, eventually discarding the wallet.

**{10}** Defendant explained to the officers that he and Victim never got into a fight, that Victim never hit him, and that there was nothing in Victim's hands when Victim approached him. Defendant claimed that he never wanted to hurt anybody and that he only killed Victim because it was the only way he could get the money to buy meth. Defendant also claimed to have asked Victim at the truck if it was okay if Defendant killed him and Victim nodded his head. Detective Sullivan testified that it appeared Defendant truly believed that had occurred and that Defendant told the officers he had been hearing voices for five years. Detective Sullivan further testified that Defendant did not say he was hearing voices at the time he spoke with the officers.

**{11}** Along with another offense that Defendant does not challenge on appeal, the jury found Defendant guilty of armed robbery, in violation of NMSA 1978, Section 30-16-2 (1973), and first-degree felony murder, in violation of NMSA 1978, Section 30-2-1(A)(2) (1994). The district court vacated Defendant's conviction for armed robbery because it was the predicate felony for the felony murder conviction. Defendant was sentenced to life imprisonment for the felony murder and appeals his conviction directly to this Court pursuant to Rule 12-102(A)(1) NMRA.

## II.    DISCUSSION

**{12}** Defendant raises two issues on appeal, arguing that the district court erred by (A) not granting his motion to suppress his statements to police and (B) not providing the jury with the requested self-defense instruction. We discuss each issue in turn.

## A. Suppression of Defendant's Statements

**{13}** Defendant first argues that his statements to police should have been suppressed because he did not knowingly and intelligently waive his rights before the police began questioning him. The right against self-incrimination arises from the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.[1] *See Malloy v. Hogan*, 378 U.S. 1 (1964). To protect this right, the United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), that police must advise a suspect, before custodial interrogation, "that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." A suspect "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* There are "two distinct dimensions" to the question of whether a suspect voluntarily, knowingly, and intelligently waived his or her *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*State v. Fekete*, 1995-NMSC-049, ¶ 49, 120 N.M. 290, 901 F.2d 708 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

**{14}** In response to a motion to suppress, the State bears the burden of proving by a preponderance of the evidence that a waiver was voluntary, knowing, and intelligent. *State v. Barrera*, 2001-NMSC-014, ¶ 22, 130 N.M. 227, 22 P.3d 1177. To determine whether the State met its burden, a district court must assess "the totality of the circumstances and the particular facts, including consideration of the mental and physical condition, background, experience, and conduct of the accused as well as the conduct of the police," indulging "[e]very reasonable presumption against waiver." *State v. Martinez*, 1999-NMSC-018, ¶ 14, 127 N.M. 207, 979 P.2d 718 (internal quotation marks and citation omitted). In the present case, Defendant moved to suppress his statements to the police based on the following facts.

## 1. Factual and Procedural Background

---

[1] Both below and on appeal, Defendant has argued that the New Mexico Constitution provides greater protection than the U.S. Constitution. However, no New Mexico case has interpreted the right against self-incrimination under Article II, Section 15 of the New Mexico Constitution to provide broader protection than its federal counterpart. *See, e.g.*, *State v. Rivas*, 2017-NMSC-022, ¶ 27, 398 P.3d 299 (stating that the federal and state protections against self-incrimination require that *Miranda* warnings be given). Therefore, to preserve the issue for review, Defendant was required to argue to the trial court why the state provision should be interpreted more broadly than the federal provision, which he did not do. *State v. Gomez*, 1997-NMSC-006, ¶ 23, 122 N.M. 777, 932 P.2d 1.

**{15}**   Detective Sullivan and Detective Andrew Hsu met with Defendant the day after he was arrested. Detective Hsu explained that before the officers could ask Defendant any questions they had to give him his *Miranda* warnings, which Defendant indicated he was aware of. Detective Hsu read Defendant the required warnings and Defendant explained each right in his own words. When Detective Hsu explained that Defendant had the right to stop answering questions at any time, Defendant said that he wanted to talk to an attorney. After Defendant invoked his right to counsel, Detective Hsu outlined the evidence police had already collected and explained the criminal charging process but did not ask Defendant any further questions.

**{16}**   A week later, Detectives Hsu and Sullivan accompanied a crime scene specialist to the Metropolitan Detention Center (MDC) to execute a warrant for buccal swabs, major case prints, and photographs. The detectives were aware at the time that Defendant was being detained in the psychiatric care unit at MDC. As the specialist was collecting the physical evidence, Defendant twice confessed to the crime unprompted by any question. After Defendant's first statement, Detective Hsu told Defendant that they would have to go over his rights again if he wanted to talk about the incident.

**{17}**   When the specialist finished collecting the physical evidence, the detectives again advised Defendant of his rights. As Detective Hsu read the rights, Defendant said that he understood each right and explained the rights in his own words. Defendant waived his rights and the detectives began asking him questions about the incident.

**{18}**   Soon after the detectives started asking Defendant questions, he began to talk about his belief that people can hear his thoughts. He claimed that people around him will react to his thoughts and that he believes those people are involved with the Illuminati, demons, or perhaps his dead father who is part of an organization conducting experiments on him. Defendant also said that he hears voices as if he is hearing other people's thoughts. Defendant explained that he believes reality is a simulation and that Victim merely left the simulation when Defendant killed him. He also expressed a belief that when he kills himself he will also leave the simulation and be in reality. Defendant claimed that these ideas were "one hundred percent real" to him.

**{19}**   Defendant explained that he had been diagnosed with schizophrenia five years earlier. He told the detectives that he had been prescribed several medications for his schizophrenia but was not taking those medications at the time of the stabbing or at the time of the interview. Defendant made two statements that indicated he was experiencing delusions during the interview. First, he claimed that he heard Detective Sullivan call him a liar when she did not. Second, he claimed that the Illuminati "twitched [his] leg" as he was speaking.

**{20}**   Before the trial, Defendant moved to suppress his statements to police. In his written motion, Defendant focused on an argument that his statements were not made voluntarily.[2] Defendant also contended, without much explanation, that he had not

_____

2 Defendant also argued that his statements should be suppressed because he invoked his right to counsel at the first interview. The district court rejected this argument on the grounds that Defendant initiated the second interview with police. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding

knowingly, intelligently, and voluntarily waived his rights because he was sleep deprived and hallucinating. At the suppression hearing, Defendant developed this claim by arguing that his waiver was not made knowingly because he believed that the police could hear his thoughts and therefore already knew everything. The only pieces of evidence presented at the hearing were the recordings of the interviews and the testimony of Detective Hsu.

**{21}** At the hearing, the district court recognized that Defendant was arguing that his mental state affected his ability to waive his rights knowingly and intelligently. The district court rejected this argument, stating that without more information about Defendant's apparent delusions there was not enough to conclude that those delusions impacted Defendant's ability to waive his rights. In the written order denying the motion to suppress, the district court did not discuss whether Defendant knowingly and intelligently waived his rights and instead only ruled on whether Defendant's statements were made voluntarily.

## 2.    Standard of review

**{22}** "Appellate review of a district court's decision regarding a motion to suppress evidence involves mixed questions of fact and law." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. We review the district court's findings of fact for substantial evidence. *Barrera*, 2001-NMSC-014, ¶ 23. The ultimate question of whether the waiver was valid is a question of law which we review de novo by assessing the totality of the circumstances. *Id.*; *Martinez*, 1999-NMSC-018, ¶ 14.

**{23}** Defendant argues that the district court applied an incorrect legal standard in its written order and we should therefore remand for a new suppression hearing without considering whether his waiver was knowing and intelligent. While it is true that the district court's written order did not address both dimensions of a valid waiver under *Fekete*, 1995-NMSC-049, ¶ 49, the district court did make findings both at the hearing and in its written order which relate to whether Defendant understood his rights and the consequences of waiving them. Additionally, the district court relied on those findings at the hearing to reject Defendant's argument that his delusions prevented him from knowingly and intelligently waiving his rights. Because the ultimate question of whether the waiver was valid is a legal question reviewed de novo, we will consider on appeal whether Defendant's waiver was made knowingly and intelligently.

## 3.    Defendant's waiver was made knowingly and intelligently

**{24}** On appeal, Defendant does not challenge the district court's conclusion that his waiver was made voluntarily and instead only argues that his mental illness prevented him from making a knowing and intelligent waiver. Specifically, Defendant argues that his delusional belief that people can hear his thoughts caused him to think it was

that if a suspect has invoked the right to counsel the police may not interrogate the suspect until counsel has been made available, unless the suspect initiates the communication). Defendant does not appeal this ruling.

pointless to exercise his rights because the detectives already knew everything. Considering the totality of the circumstances surrounding Defendant's waiver, we disagree.

**{25}** During his interview at the MDC, Defendant expressed apparent beliefs that the Illuminati control his life, that reality is a simulation, and that other people can hear his thoughts. Defendant's statements indicate that he specifically believed that Detectives Hsu and Sullivan could hear his thoughts and were connected in some way to the Illuminati. These beliefs appeared to influence what Defendant told the detectives. For instance, Defendant was initially hesitant to tell police what drugs he was using but later changed his mind because he thought the detectives could hear his thoughts and he did not want to lie to them. The district court recognized that these statements were "concerning and disturbing" but was also concerned that there was no evidence explaining the effect of these apparent delusions on Defendant's ability to waive his rights.

**{26}** The district court also found several facts that indicate Defendant was able to and did indeed understand his rights. First, Defendant asserted his right to counsel when Detectives Hsu and Sullivan first attempted to question him after the arrest. Second, before he waived his rights Defendant indicated that he understood those rights and accurately explained them in his own words. Finally, the district court found that Defendant was cogent during the interview, that his recollection of the events was corroborated by eyewitness testimony, that he could appreciate the moral magnitude of his actions, and that he was able to discuss his current condition at MDC. The record supports these findings.

**{27}** On appeal, Defendant argues that his delusions that the Illuminati control his life and that people can hear his thoughts caused him to think that there was no point in exercising his rights. While the record supports this assertion, this argument concerns Defendant's motivation for not exercising his rights rather than his understanding of those rights and the consequences of waiving them.

**{28}** Both times Detective Hsu read Defendant his rights, Defendant was able to effectively and cogently articulate that he understood that he did not have to speak to the detectives and that they would use what he said as evidence against him. This is the level of understanding required for a waiver to be knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (explaining that a waiver is knowing and intelligent if the suspect understands "that he [or she] had the right to remain silent and that anything he [or she] said could be used as evidence against him [or her]"). The United States Supreme Court has indicated a waiver may be made knowingly and intelligently even if the suspect's decision to waive his or her rights was not rational or wise. *See id.* at 568, 576-77 (holding that providing a suspect with additional information about all of the crimes law enforcement is investigating "could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature"); *Moran*, 475 U.S. at 422 (holding that law enforcement is not required to provide "a suspect with a flow of information to help him [or her] calibrate his [or her] self-interest in deciding whether to

speak or stand by his [or her] rights" for that suspect's waiver to be knowing and intelligent).

**{29}** The recording of the interview at the MDC demonstrates that Defendant's mental illness did not affect his understanding of his rights but rather his motivation for not exercising those rights. No other evidence was presented concerning Defendant's claimed diagnosis of schizophrenia or its effect on his ability to comprehend his rights. Because the record otherwise supports the district court's findings that Defendant was cogent and could accurately articulate his rights and the consequences of abandoning them, the totality of the circumstances demonstrates that Defendant's waiver was knowing and intelligent. *See Fekete*, 1995-NMSC-049, ¶ 51 (concluding that the defendant's waiver was knowing and intelligent based on evidence in the record that the defendant was able to understand "the meaning and consequences" of waiving his rights despite the defendant's established history of paranoid schizophrenia).

## B.    Self-Defense

**{30}** Defendant additionally contends that the district court erred when it denied his request to provide the jury with an instruction on self-defense. At trial, Defendant moved for a self-defense instruction after the close of evidence. Defendant argued that a self-defense instruction was warranted because there was evidence that Victim pursued Defendant into the street and that there was a mutual altercation between the two men. Finding that no evidence had been presented that Victim attacked Defendant, the district court concluded that a self-defense instruction was not warranted.

**{31}** We review the district court's denial of a self-defense instruction de novo. *State v. Gaines*, 2001-NMSC-036, ¶ 4, 131 N.M. 347, 36 P.3d 438. "We do not weigh the evidence but rather determine whether there is sufficient evidence to raise a reasonable doubt about self-defense." *Id.* If there is "a sufficient quantum of proof to warrant" a self-defense instruction, it is reversible error to deny the instruction. *Id.*

**{32}** "An instruction on self-defense requires evidence that (1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed." *State v. Baroz*, 2017-NMSC-030, ¶ 14, 404 P.3d 769 (internal quotation marks and citation omitted). A self-defense instruction is only required if there is evidence supporting each of these elements. *Id.* To warrant a self-defense instruction "there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense. If any reasonable minds could differ, the instruction should be given." *State v. Sandoval*, 2011-NMSC-022, ¶ 17, 150 N.M. 224, 258 P.3d 1016 (internal quotation marks and citation omitted). "[W]e review the evidence in the light most favorable to the giving of the self-defense instruction[.]" *State v. Ellis*, 2008-NMSC-032, ¶ 2, 144 N.M. 253, 186 P.3d 245.

**{33}** Viewed in the light most favorable to giving a self-defense instruction, the evidence in this case indicates that there was a mutual altercation between Victim and Defendant. At most, there is evidence that Victim struck Defendant before Defendant

stabbed Victim. There was no testimony that Victim had drawn a weapon before being stabbed.

**{34}** We have held that evidence of a simple battery against a defendant is insufficient for a reasonable jury to find that the defendant acted reasonably by responding with deadly force. "[D]eadly force may not be used in a situation involving simple battery or in a struggle in which there has been no indication that death or great bodily harm could result." *State v. Lucero*, 2010-NMSC-011, ¶ 15, 147 N.M. 747, 228 P.3d 1167 (quoting *State v. Duarte*, 1996-NMCA-038, ¶ 4, 121 N.M. 553, 915 P.2d 309). Accordingly, the evidence presented in this case was insufficient to support a self-defense instruction, even when viewed in the light most favorable to the giving of the instruction. Because we affirm the district court's denial of the self-defense instruction on this ground, it is unnecessary to address the parties' arguments concerning Defendant's initial aggression and whether he had regained the right to self-defense by retreating.

## III. CONCLUSION

**{35}** We affirm Defendant's conviction for first-degree felony murder because (1) the record demonstrates that Defendant's waiver of his *Miranda* rights was made knowingly and intelligently, and (2) the evidence was insufficient to entitle Defendant to a self-defense instruction.

**{36} IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**